Richard **CASTILLO,** Petitioner,

v.

Ken **CLARK,** Warden,[1] Respondent.

No. CV 06–4111–AHM (RNB).

United States District Court,
C.D. California.

March 27, 2009.

---

1. Warden Clark is hereby substituted as respondent for Warden Kernan pursuant to Fed.R.Civ.P. 25(d)(1).

Richard Castillo, Tehachapi, CA, pro se.

Daniel Chi-Sum Chang, Attorney Generals Office, Los Angeles, CA, for Respondent.

## ORDER ADOPTING FINDINGS, CONCLUSIONS AND RECOMMENDATIONS OF UNITED STATES MAGISTRATE JUDGE

A. HOWARD MATZ, District Judge.

Pursuant to 28 U.S.C. § 636, the Court has reviewed the Petition, all the records and files herein, including the Report and Recommendation of the United States Magistrate Judge. Objections to the Report and Recommendation have been filed herein. Having made a *de novo* determination of those portions of the Report and

Recommendation to which objections have been made, the Court concurs with and adopts the findings, conclusions and recommendations of the Magistrate Judge.

IT THEREFORE IS ORDERED that Judgment be entered denying the Petition and dismissing this action with prejudice.

## REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

ROBERT N. BLOCK, United States Magistrate Judge.

This Report and Recommendation is submitted to the Honorable A. Howard Matz, United States District Judge, pursuant to the provisions of 28 U.S.C. § 636 and General Order 194 of the United States District Court for the Central District of California.

### PROCEEDINGS

On June 22, 2006, petitioner lodged for filing a Petition for Writ of Habeas Corpus by a Person in State Custody ("Pet.") herein. The Petition alleged nine separate grounds for relief.

Following three extensions of time, respondent filed an Answer to Petition ("Ans."), including a supporting Memorandum of Points and Authorities ("Ans.Mem."), on December 6, 2006. Concurrently, respondent lodged copies of the relevant state court records, including the Probation Report (which was lodged under seal). Respondent contended therein *inter alia* that three of petitioner's grounds for relief were unexhausted (i.e., Grounds One, Seven, and Eight). (*See* Ans. at 2; Ans. Mem. at 24–30).

Following an extension of time, petitioner filed a Traverse ("Trav.") on January 26, 2007. Then, on November 27, 2007, petitioner filed a document captioned "Motion to Leave to Amend the Traverse to Respondent's Return to First Petition for Writ of Habeas Corpus." Specifically, pe-titioner sought to augment his arguments with respect to Ground One of the Petition. On April 16, 2008, the then-assigned Magistrate Judge granted petitioner's Motion, advised that he would construe the Motion as a "Supplemental Traverse" ("Supp.Trav."), and ordered respondent to file a response thereto. Following two extensions of time, respondent filed a Response to Supplemental Traverse on July 2, 2008. That same date, the case was transferred from the calendar of Magistrate Judge Rayburn to the calendar of Magistrate Judge Block.

Thus, this matter now is ready for decision. For the reasons discussed hereafter, the Court recommends that the Petition be denied.

### PROCEDURAL HISTORY

On January 6, 2004, a Los Angeles County Superior Court jury found petitioner guilty of first degree murder (with a special circumstance finding that he personally and intentionally discharged a firearm proximately causing death), attempted murder, shooting at an occupied motor vehicle, and being a convicted felon in possession of a firearm. As to the first three offenses, the jury also found true sentence enhancement allegations based on the discharge and use of a firearm. The jury was unable to reach a unanimous verdict with respect to other sentence enhancement allegations, and the trial court declared a mistrial as to those. (*See* Clerk's Transcript on Appeal ["CT"] 220–22; 5 Reporter's Transcript on Appeal ["RT"] 3301–11).

At the ensuing sentencing hearing held on March 16, 2004, after hearing from friends and family members of the murder victim and also affording both counsel the opportunity to be heard, the trial court imposed a term of 25 years to life on count one (first degree murder) plus a consecutive term of 25 years to life for the Cal.Pe-

nal Code § 12022.53(d) sentence enhancement (personal and intentional discharge of a firearm proximately causing death). The court stayed a 20–year sentence enhancement under § 12022.53(c) (personal and intentional discharge of a firearm) and a 10–year enhancement under § 12022.53(b) (personal use of a firearm). With respect to count two (attempted murder), the court imposed an upper term of nine years. The court additionally imposed a consecutive 20–year sentence pursuant to § 12022.53(c) and stayed a 10–year sentence under § 12022.53(b). The court specified that the sentences in counts one and two were to run consecutively. With respect to count three (shooting at an occupied motor vehicle), the court imposed the mid-term of five years but stayed the sentence pursuant to Cal.Penal Code § 654. With respect to count four (felon in possession of a firearm), the court imposed one-third the mid-term sentence of two years consecutive to count two. The total aggregate sentence was 79 years and 8 months to life. (*See* CT 240–46; 5 RT 3607–31).

Petitioner appealed his conviction and sentence, raising claims generally corresponding to the claims being alleged in the Petition herein. (*See* Respondent's Notice of Lodging, ["Lodged Doc."] # 3). In an unpublished decision issued on November 15, 2005, the California Court of Appeal rejected petitioner's claims and affirmed the judgment in its entirety. (*See* Lodged Doc. # 6). Petitioner's appellate counsel proceeded to file a "Petition for Review to Exhaust State Remedies" pursuant to former Rule 33.3 of the California Rules of Court. (*See* Lodged Doc. # 7). On January 25, 2006, the California Supreme Court summarily denied the Petition for Review without citation of authority. (*See* Lodged Doc. # 8).

Petitioner did not seek collateral relief in state court. (*See* Pet. at 4).

## SUMMARY OF THE EVIDENCE PRESENTED AT TRIAL

Because Ground Five of the Petition could be construed as encompassing an insufficiency of the evidence claim, the Court has independently reviewed the state court record. *See Jones v. Wood,* 114 F.3d 1002, 1008 (9th Cir.1997). The following is a summary of the evidence presented at trial.

On July 19, 2002, friends and roommates Giovanni Carboni and Fernando Lozano, Jr., drove to Olvera Street in downtown Los Angeles to have brunch. They arrived around 1:00 that afternoon and stayed until 2:30 or 3:00 p.m., at which time they headed home. Carboni had one beer and Lozano had three margaritas. Carboni was driving his tan 1992 Ford Explorer. He headed northeast from downtown on Broadway, electing not to take the freeway to avoid traffic. He turned north on Lincoln Park Avenue and then turned on North Flora Avenue. He found himself in an unfamiliar neighborhood and mistakenly turned south, instead of north, on Sierra Street. (*See* 2 RT 910–18, 923, 938–39, 974).

Traffic was moving slowly on the narrow street, and Carboni saw petitioner (whom he identified in court) driving northbound on Sierra Street. No one was in the car with petitioner. (*See* 2 RT 918–21, 923, 990, 1044–45). As the two cars passed each other, petitioner yelled "What up [sic], fool?" to Carboni. Carboni characterized petitioner's attitude as if "he wanted to confront us or start something with us, start problems." Carboni was uncomfortable and said nothing. Lozano, however, yelled the same question back. (*See* 2 RT 924–25). · Carboni "got nervous" and decided to make a U-turn. He had seen petitioner turn left onto Flora Avenue and felt that petitioner was trying to catch up

to them. He was afraid that petitioner "would do something." (*See* 2 RT 925–26).

Looking in the rear-view mirror, Carboni saw petitioner behind him, also traveling northbound on Sierra, "speeding" towards his car. Carboni kept driving, and petitioner pulled up along his left side. There was little traffic. Carboni slowed down because he did not want petitioner to chase them. He did not recall coming to a stop and did not believe petitioner's car came to a stop either. He thought petitioner was a "gangster" based on his attire and shaved head. (*See* 2 RT 926–29, 994–95). Neither Carboni nor Lozano had any gang affiliations, nor any gang tattoos. (*See* 2 RT 925; 4 RT 1917). Petitioner then yelled "Where are you from?" The two cars were only a couple of feet apart, and the windows on each were rolled down. Carboni replied that he wasn't from any gang, and he wasn't from around the area. Petitioner said, "Then what the fuck are you looking at?" Carboni replied, "I am not even looking at you." Then Lozano yelled, "At your ugly fucking face." In response, petitioner immediately pulled a gun from his lap and shot two or three times at Carboni's car. Carboni described petitioner's gun as a small "black revolver." (*See* 2 RT 929–31, 940, 994, 999, 1001).

Carboni testified that he "saw a gun come out." Petitioner extended his arm and pointed the gun directly at Carboni. (*See* 2 RT 932, 1000). Carboni raised his arms and leaned back into his seat as far as he could. As the shots were being fired, he saw glass shatter to his left. None of the windows on his car were broken during the incident. His car was struck in the driver's door, but Carboni was not hit. He did receive "marks on his left arm" that he described as looking like "specks of blood under the skin." (*See* 2 RT 933–36, 949, 1002). The gunshot resi-

due testing of his hands was inconclusive. (*See* 3 RT 1525–26).

Petitioner sped off, and Carboni followed in order to get his license plate number. Carboni thought petitioner's car was an old grayish Honda. Carboni followed petitioner for approximately a block until he could read the number, then he slowed down; petitioner continued driving rapidly northbound on Sierra. Carboni looked over at Lozano and discovered that he had been hit. Lozano was bleeding from the head, and his left arm and head were hanging down. Carboni tried to rouse him, then Carboni turned right and stopped the car. He could feel a pulse, so he tried to call 911 on his cell phone. He found he did not have any reception, so he ran to a nearby house and asked the woman occupant to call the police. (*See* 2 RT 935, 939–42, 944, 961, 1018).

Lozano was pronounced dead at the scene where he sat in Carboni's car after the police and paramedics arrived. This was near the intersection of Mercury Avenue and Sierra Street. (*See* 2 RT 942, 944). Lozano died from a gunshot wound to the head. He also had a gunshot wound to his left shoulder with an irregular entrance wound that indicated that the bullet had hit an intermediate target before reaching Lozano's shoulder. This was consistent with having traveled through glass first. (*See* 3 RT 1538–41). The victim had alcohol in his blood, but no trace of any illegal substance was found. (*See* 3 RT 1550–52). Lozano had gunshot residue on his left hand, but not on his right. This might have come from proximity to a weapon when it was discharged (up to 14 feet) or from touching a surface that contained gunshot residue. (*See* 3 RT 1282–85, 1294). Lozano was right-handed. (*See* 3 RT 1505, 1513).

Neither Carboni nor Lozano was wearing a shirt at the time. It was a very hot

day and both men had taken their shirts off at some point during the afternoon. Carboni had left his on the back seat of his car. (*See* 2 RT 933, 975–76, 1015). Carboni denied having a gun or using a gun. He denied that Lozano had ever used guns and testified that neither he nor Lozano had ever practiced target shooting. (*See* 2 RT 950). Lozano had a round Aztec calendar tattooed on his upper arm just below the shoulder. Carboni had two tattoos: a black star below the elbow on the inside of his left forearm and the symbol for Aquarius on his back. (*See* 2 RT 976–79). At the time of the incident, Carboni had a shaved head and a full beard. Lozano had a full head of hair, a beard, and a mustache. (*See* 2 RT 979–80).

Carboni identified photographs of an Acura as the car that petitioner was driving during the incident. (*See* 2 RT 951–52). The license plate number that Carboni gave to the police was 2JTG643. (*See* 2 RT 939, 952–53). A few hours after the incident, he wrote a 2–page account of the incident in his own handwriting at the request of a police officer. (*See* 2 RT 953, 956–57).

Carboni testified that he told the police that petitioner had "pockmarks on the face," was Hispanic, between 20 and 30, and was wearing a short-sleeved, white T-shirt. (*See* 2 RT 960–61). Carboni later identified petitioner in a photographic lineup and again in court. (*See* 2 RT 923, 961–64, 1044–45; 3 RT 1234–38). He had never met petitioner before the incident. (*See* 2 RT 964–65).

During cross-examination, Carboni testified that he had been to Olvera street hundreds of times in his life and was familiar with the area. He did not necessarily take the freeway to get there or to return home. But he had never been in the general area where the incident took place. (*See* 2 RT 968–70). Carboni agreed that it was possible that Lozano's words sounded like "fighting words." Carboni told the police after the incident that Lozano had yelled the words, that Carboni thought Lozano "was being a little violent," and that Lozano had had too much to drink. (*See* 2 RT 995–97). Carboni was not looking at Lozano and did not know if Lozano made any gestures during the incident. (*See* 2 RT 997–98).

Dion Jones, who was 11 at the time of the incident, lived in the area of Sierra and Mercury. On July 19, 2002, he was walking to the store, going south on Sierra towards Flora on the east side of the street. He saw two cars, one of which he recognized as an Explorer. The cars were coming towards him, and the Explorer was in its own lane. There were two people in the Explorer. He had seen the other car (which he described to the police afterwards as a light blue or purple Mazda or Nissan) in the neighborhood once before the incident. (*See* 2 RT 1049–50, 1052–55). Jones thought that both cars were stopped. The bluish car was going in the same direction, and was next to the Explorer. He could hear voices, but he could not hear what was being said. Then he heard two gunshots; he could not tell from which car they originated. He did not see a gun in either car, and he did not see the men in the Explorer throw anything from their car. Jones saw the passenger in the Explorer grab his head immediately after the gunshots. The other car then drove off very quickly, and the Explorer followed more slowly. (*See* 2 RT 1055–58, 1063, 1077–78).

In court, Jones testified that he did not recall seeing the driver of the second car. He did recall looking at photographs the police showed him, and he recalled identifying one of the men in the photographs. He agreed that he had written on the photo identification report that: "Picture 2 looks like the person in the car that shot at

the guys in the gold Explorer. He looks like the guy up the street." He had identified petitioner as the person who was the shooter before he said that he knew him from the neighborhood. (*See* 2 RT 1058–61, 1083; 4 RT 1876, 1911). Jones testified that the man he identified in the photograph "hangs out at the street," right across from a school at Mercury and Sierra. (*See* 2 RT 1061–62). Jones told the police that he had seen petitioner the day before the shooting at that intersection. (*See* 2 RT 1062). He also had seen petitioner in the car in the neighborhood about three days before the shooting. (*See* 2 RT 1083). Jones saw a tattoo on the shooter's left arm; the shooter was wearing a short-sleeved shirt. (*See* 2 RT 1066). But he admitted during cross-examination that he was confused about the arms and testified that the tattoo he had seen was on the shooter's right arm. (*See* 2 RT 1076–77).

Jones testified that he was nervous to be in court and had asked that his grandmother sit next to him while he testified. (*See* 2 RT 1048, 1050, 1067). The prosecutor described his posture as sitting facing towards the jury with his left hand by his face, covering his eyes. Jones denied that he was afraid to look around the courtroom. But he admitted that he was afraid of what might happen.[2] He denied that he had talked to his aunt about the case "in a long time." He denied that his aunt was upset about the prospect of his testifying and stated that she was only mad because he was being taken out of school. He again denied that he was afraid to identify the shooter in court, but he admitted that it was hard for him to testify. (*See* 2 RT 1068–72). Finally, Jones agreed that he saw the man he previously had identified in the photographs in court, and he pointed out petitioner. (*See* 2 RT 1072–73).

When the prosecutor showed Jones photographs of petitioner's car, Jones initially testified that he did not remember if it was the same car, but then he testified that "[t]he rims look different." He agreed that it was the same size, and that the car the shooter was driving had four doors. He thought that the car he had seen was a bit lighter in color than the one in the photographs. (*See* 2 RT 1085–87).

Officer Alvarez, who interviewed Jones at about 5:00 p.m. on the day of the incident, testified that Jones described the suspect as a male Hispanic, 20 to 30, bald, light complexion, blue shirt, with a tattoo on his left arm. (*See* 3 RT 1521–23).

Police Officer Pavel Gomez was the first officer to report to the scene after receiving a call about a shooting victim. He and his partner responded to the intersection of Sierra and Mercury, which he knew from his experience with the Gang Unit to be within the geographic area of the Happy Valley Gang. He was flagged down by Carboni who "looked panicked" and said his friend had been shot. The victim was sitting in the front passenger seat of Carboni's vehicle; he was not breathing and had gunshot wounds to the left side of his head and his left shoulder. No firearms were in the car and the officer did not observe anything at the scene or in the area that indicated that Carboni or the victim had had any firearms. (*See* 3 RT 1203–07). He accompanied Carboni to the location where Carboni thought the shooting had taken place, about two or three blocks down Sierra, and cordoned off the area. The officer did not find any type of weapon, expended ammunition, or broken glass. (*See* 3 RT 1208, 1214, 1217–18, 1220). No evidence was found during the

---

**2.** Jones apparently started crying during this portion of his testimony because the prosecutor requested some kleenex. (*See* 2 RT 1071).

investigation that Carboni or Lozano had a gun. (*See* 4 RT 1921).

Officer Gomez testified that Carboni described the shooter as a male Hispanic, 18–25, wearing a white T-shirt, with a shaved head and acne on his face. Carboni described the car as an 80s to 90s grey Honda Civic. (*See* 3 RT 1213).

Officer James Kesser testified that he heard the radio call about the shooting and responded about 3:30 p.m. to Mercury and Sierra. He was provided with a description of the suspect, and he had returned to the police station. He knew the neighborhood to be within the territory of the Happy Valley Gang. He reviewed the "Happy Valley Gang book," and obtained two names of possible suspects based on Carboni's description of noticeable pock marks on the man's face. One of the men was petitioner. He also located a third possible suspect from the Cal Gangs computer system. He assembled three six-packs with the suspects' photographs. He placed petitioner's photograph in location two on one of the six-packs. (*See* 2 RT 1231–38).

Nathan Gross, a criminologist with the Los Angeles Police Department ("LAPD"), testified that he recovered a lead projectile from inside the door of Carboni's Explorer, and he examined two fragments that were recovered from the body of Lozano. He could not determine if the three fragments came from two or three bullets. They were consistent with a .22 caliber bullet. (*See* 3 RT 1248, 1251–55, 1264). Another criminologist also examined a blue, four-door 1990 Acura Legend that had been impounded. The car appeared to have been cleaned on the inside, but was dirty on the outside. The small, right rear "opera" window on the passenger side had been broken. (*See* 3 RT 1259–60).

Gross also testified that, when a firearm is discharged close to an individual, gunshot residue can cause injury to the skin to around two feet in front of the muzzle. The injury, called stippling, would appear like red dots on the skin. Stippling could also be caused by glass broken by a bullet. In addition, gunshot residue might be deposited on the intended target of a shooting. (*See* 3 RT 1261–63, 1266, 1268).

Detective Cynthia Juarez was placed in charge of the investigation of Lozano's murder on the day of the incident. She obtained the license plate information that Carboni had obtained. After conducting various computer checks with different combinations of the letters and numbers Carboni had reported, she identified a blue Acura with a plate of 2TJG465. The car was linked to petitioner because he had earlier received a citation while driving the vehicle. (*See* 4 RT 1827, 1875–76). In addition, Detective Cortinas told Juarez that she had photographed the vehicle on August 3, 2002, on the corner of Sierra Street and Mercury Avenue. (*See* 4 RT 1877–79).

Sergeant John Zumwalt testified that he made a traffic stop on a dark blue, Acura Legend with the license plate 2TJG465 on August 7, 2002, in the City of Covina. The interior was exceptionally clean, but the small passenger window in the rear was "smashed out." It still contained small glass fragments along the bottom edge. One of the two men in the car, Richard Ortega, told him that he was a gang member from Glassell Park in Los Angeles. Sergeant Zumwalt determined that the car was listed as having been involved in a murder case, and he impounded the car. DMV records indicated that the registration on the car had been transferred to Ortega on August 2, 2002, from Romerio Rojas. Petitioner's name was not listed in the DMV records as an owner of the Acura. (*See* 4 RT 1560–73, 1914).

Richard Ortega testified that he did not know petitioner, and that he had never

seen him before coming to court. He obtained the Acura in early August. He testified that he informed Detective Juarez when she questioned him that he did not want to talk unless he had a lawyer and that he had obtained the car from the guy listed on the pink slip. He denied telling her that he got it from a "homie." He registered the car the day he got it. He claimed that the window was broken when someone tried to break into the car. He also testified that he bought new rims for the car. He admitted that, at the time of the traffic stop, he was a member of the Glassell Park gang, which was two to three miles from the territory of Happy Valley. (*See* 4 RT 1848–53, 1862–66).

Detective Cynthia Juarez testified that she interviewed Ortega about the Acura and he told her that he had purchased the vehicle from a homie. (*See* 4 RT 1881–82).

Glendale Police Officer Tigran Topadzhikyan testified that he issued a traffic citation to petitioner on March 23, 2002 at 12:05 a.m. The vehicle petitioner was driving at that time was an older blue Acura, license plate 2TJG465. The officer recalled that the individual was "very distinctive looking" because of his pockmarked face and thin mustache. He identified petitioner as the person to whom he had issued the citation, and the officer identified the photograph of petitioner's car as the vehicle he had stopped. (*See* 4 RT 1819–24).

Detective Juarez also testified that she interviewed Dion Jones after the incident on August 2, 2002, at his home, and then transported him to the station and conducted a videotaped interview with him. Jones was nervous and reluctant, and he told the Detective that he was afraid that something would happen to him. Juarez also talked to Jones's aunt while Jones was present. His aunt was very angry and upset, and she told Juarez that Jones did not want to remember anything. She said that she did not want Jones to testify. (*See* 4 RT 1827–29, 1833–35, 1873, 1912). Jones's grandmother also told Juarez (when Jones was present) that Jones was very nervous and upset. She told the police office she wanted the family to be relocated. Juarez testified that there was no evidence that petitioner or anyone on his behalf had ever threatened Jones or his family. (*See* 4 RT 1873–74, 1912–13).

Raul Castro testified that he knew petitioner's name, but he had never met him. He identified petitioner in court. He knew that petitioner went by the name of "Richie." In 1989, Castro was dating petitioner's cousin, Gina. On November 11, 1989, Castro was visiting Gina with a friend. They were standing outside her place, which was near Sierra and Flora, talking to her when he noticed a man riding around on a bicycle, looking at them. Gina told them that they should leave before something happened. Castro saw petitioner "throw gang signs" and "flash" a gun at them. (*See* 4 RT 2117–20, 2124, 2128). Castro and his friend drove away, and Castro saw petitioner point a gun at them. (*See* 4 RT 2123). Petitioner then fired three or four shots at the departing car. Castro's friend drove to the corner of Lincoln Heights Avenue and Flora and found a police officer writing a ticket. They told the police officers about the incident. Castro was positive that it was petitioner who had shot at them that day. (*See* 4 RT 2124–25). Castro denied that he was ever a member of a gang, but he testified that he had had family members who were in gangs. At the time he testified, he worked as a mechanical engineer at a major hospital. (*See* 4 RT 2125–26).

Retired Los Angeles Police Officer Bruce Spradling testified that, before he retired, he had investigated Castro's complaint against petitioner in 1989 as an assault with a deadly weapon. The victims

identified petitioner from his highschool yearbook photograph. Officer Spradling identified petitioner in court as the man he had arrested in 1989. He testified that he recalled petitioner's pockmarked facial features and the tattoos on his hand. (*See* 4 RT 1924–28). Spradling made a written statement from two interviews he conducted with petitioner and then had petitioner sign the statement. In the statement, petitioner stated that he was in the area of Flora and Sierra visiting his old neighborhood. He saw a guy named Raul at his cousin's house. He and Raul had had words a few months earlier and he thought that Raul was "putting [his] neighborhood down." Petitioner had a 357 Magnum revolver, and he borrowed a bicycle from a kid on the street. He waited for Raul to leave his cousin's house. As Raul and his friend drove by, he "fired four shots at the car." He sold the gun to a guy at Sierra and Mercury before he left the area the next morning. (*See* 4 RT 1928–32). At the time that petitioner signed the statement, he was under arrest for a felony. (*See* 4 RT 1934–35).

Detective William Eagleson testified as a gang expert. He testified that he was familiar with the Happy Valley Gang, and its territory included Sierra Street near Mercury. In 2002, the LAPD was tracking approximately 10 to 24 of its active gang members. The Happy Valley Gang had been a long-established gang for decades, and it had a reputation for creating an atmosphere of fear and intimidation within the community. He testified that the gang was very territorial. Anyone coming into their territory was "subject to being hit up." It was a generational gang, where gang members had brothers, uncles and other relatives in the gang. There was also a "long standing tradition of families that had moved out, but would still come back to be part of the neighborhood". (*See* 4 RT 2133–34, 2137–42, 2150, 2182). Detective Eagleson testified that, if an out-

sider comes into the gang's territory and insults a gang member, "he's gonna [sic] be killed." He emphasized how important it is for a gang member to instill fear and intimidation in their neighborhood. Disrespecting a gang member on his own territory would result in extreme violence, including murder. (*See* 4 RT 2157–58).

Detective Eagleson testified that he knew petitioner as a member of Happy Valley Gang since about 1987 based on petitioner having admitted his affiliation to the Detective and to other police officers, various field identification records, and an arrest report. He was aware that petitioner had numerous tattoos with his gang name and moniker, including a large one on his right arm from the elbow to the shoulder and one on his right wrist. (*See* 4 RT 2170–76). Eagleson also testified that the scarring on both of petitioner's cheeks was something that was unique and would be noted in the field identification reports. (*See* 4 RT 2178–79). Eagleson testified that a field identification card had been filled out on petitioner from July 7, 2002. The card indicated that petitioner had been stopped and questioned by police officers at approximately 10:25 p.m. on Sierra, north of Flora, within the territory of Happy Valley. Petitioner claimed at the time of that stop to have been with the gang for 16 years. (*See* 4 RT 2179–81). Eagleson knew that petitioner's brothers were members of the Happy Valley Gang, despite the fact that the family had moved out of the neighborhood. Only one older brother had broken completely away. (*See* 4 RT 2182–83). Other field identification cards for petitioner indicated that he continued to return to the neighborhood of his gang, particularly in the area of Flora and Sierra, which was "ground zero" for Happy Valley. (*See* 4 RT 2212–15).

Detective Eagleson testified that the phrase "What's up fool?" is a confronta-

tional phrase asking "what are you doing here?" To repeat the phrase to a gang member is a sign of disrespect. The question, "Where are you from?" is "one of the most confrontational phrases" a gang member would use. It is usually followed by violent action. (*See* 4 RT 2186–89).

The defense presented no evidence.

## PETITIONER'S CLAIMS HEREIN

1. The trial court erred in admitting other crimes evidence, thus depriving petitioner of a fair trial and constitutional due process. (*See* Pet. at 5, Exh. A(1); Trav. at 15–16; Supp. Trav. at 4–9).

2. Petitioner's Sixth and Fourteenth Amendment rights were denied when he was denied the opportunity to develop impeaching evidence against a belatedly-disclosed witness. (*See* Pet. at 5, Exh. A(1); Trav. at 16–17).

3. The trial court erred in allowing the prosecutor to bring in "double hearsay evidence" to show that prosecution witness Dion Jones was afraid to testify, especially because no threats had been made. (*See* Pet. at Exh. A(1); Trav. at 17–18).

4. Petitioner was denied his constitutional right to a jury trial when the trial court refused to give manslaughter instructions. (*See* Pet. at 6, Exh. A(1); Trav. at 18–20).[3]

5. The verdict of guilty of attempted murder must be reversed because CALJIC No. 8.66.1 allowed the jurors to convict petitioner of the attempted murder of Carboni based solely on petitioner's act of shooting directly at Lozano. (*See* Pet. at Exh. A(1); Trav. at 20–21).

6. The trial court erred in instructing the jury with CALJIC Nos. 2.71 and 2.72 because petitioner made no admissions regarding the charged offenses. (*See* Pet. at Exh. A(1); Trav. at 21).

7. Cumulative error in this close case deprived petitioner of a fair trial and constituted a miscarriage of justice. (*See* Pet. at Exh. A(2); Trav. at 21–22).

8. The sentence enhancements imposed on counts 1 & 2 should have been stricken, not stayed. (*See* Pet. at Exh. A(2); Trav. at 22–23).

9. The upper term imposed on count 2 and the consecutive terms imposed on all four counts based on the court's factual findings violated petitioner's right to a jury trial under the Sixth Amendment. (*See* Pet. at Exh. A(2); Trav. at 4–6).

## STANDARD OF REVIEW

The standard of review applicable to petitioner's claim herein is set forth in 28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"):

"An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings."

■ Under the AEDPA, the "clearly established Federal law" that controls federal habeas review of state court decisions consists of holdings (as opposed to dicta) of Supreme Court decisions "as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412, 120

---

**3.** On page 6 of the Petition, this is listed as Ground Three.

S.Ct. 1495, 146 L.Ed.2d 389 (2000); *see also Carey v. Musladin,* 549 U.S. 70, 127 S.Ct. 649, 653, 166 L.Ed.2d 482 (2006); *Smith v. Patrick,* 508 F.3d 1256, 1260 (9th Cir.2007).

Although a particular state court decision may be both "contrary to" and "an unreasonable application of" controlling Supreme Court law, the two phrases have distinct meanings. *See Williams,* 529 U.S. at 391, 413, 120 S.Ct. 1495. A state court decision is "contrary to" clearly established federal law if the decision either applies a rule that contradicts the governing Supreme Court law, or reaches a result that differs from the result the Supreme Court reached on "materially indistinguishable" facts. *See Early v. Packer,* 537 U.S. 3, 8, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002) (per curiam); *Williams,* 529 U.S. at 405–06, 120 S.Ct. 1495. When a state court decision adjudicating a claim is contrary to controlling Supreme Court law, the reviewing federal habeas court is "unconstrained by § 2254(d)(1)." *Williams,* 529 U.S. at 406, 120 S.Ct. 1495. However, the state court need not cite or even be aware of the controlling Supreme Court cases, "so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early,* 537 U.S. at 8, 123 S.Ct. 362.

State court decisions that are not "contrary to" Supreme Court law may only be set aside on federal habeas review "if they are not merely erroneous, but 'an *unreasonable* application' of clearly established federal law, or are based on 'an *unreasonable* determination of the facts.' " *Early,* 537 U.S. at 11, 123 S.Ct. 362 (citing 28 U.S.C. § 2254(d) and adding emphasis). A state court decision that correctly identified the governing legal rule may be rejected if it unreasonably applied the rule to the facts of a particular case. *See Williams,* 529 U.S. at 406–10, 413, 120 S.Ct. 1495 (*e.g.,* the rejected deci-

sion may state *Strickland* rule correctly but apply it unreasonably); *Woodford v. Visciotti,* 537 U.S. 19, 24–27, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002) (per curiam). However, to obtain federal habeas relief for such an "unreasonable application," a petitioner must show that the state court's application of Supreme Court law was "objectively unreasonable." *Visciotti,* 537 U.S. at 24–27, 123 S.Ct. 357; *Williams,* 529 U.S. at 413, 120 S.Ct. 1495. An "unreasonable application" is different from an erroneous or incorrect one. *See Williams,* 529 U.S. at 409–10, 120 S.Ct. 1495; *see also Visciotti,* 537 U.S. at 25, 123 S.Ct. 357; *Bell v. Cone,* 535 U.S. 685, 699, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002).

## DISCUSSION

### A. *Habeas relief is not warranted with respect to petitioner's claim arising out of the admission of other crimes evidence.*

Prior to trial, the prosecution sought to introduce evidence concerning petitioner's 1989 conviction for negligent discharge of a firearm. Defense counsel objected that the conviction was too remote in time and, in addition, was distinct in character. Counsel argued that the prior conviction arose from a personal matter in which the person shot at by petitioner was involved in a relationship with petitioner's cousin, whereas the present crime involved a territorial gang challenge in which the victims were unknown to petitioner. The prosecutor argued that the incidents were very similar in that: in each case, petitioner either waited for or returned to confront his chosen victims; in each case petitioner perceived that the conduct of the victims insulted his gang and insulted him in his gang's territory; in each case he fired multiple shots from a handgun at two victims in a car; in each case he disposed of the weapon afterward; and the two inci-

dents occurred within a block or so of each other in petitioner's gang territory. (*See* 2 RT 601–10).

The trial court overruled the defense objections, finding that the evidence was sufficiently similar to be relevant for purposes of motive, intent, and common scheme or plan. The court noted that one of the similarities was, according to petitioner's own signed account of the 1989 incident, that the motive in the earlier case was that a victim made derogatory comments about petitioner and petitioner's neighborhood. In the present case, the victim made "rather minor personal insults" to petitioner. In each case, the perceived insults resulted in petitioner's use of deadly force with a handgun against the occupants of a motor vehicle within petitioner's gang territory. Further, the trial court found that the time between the incidents only slightly mitigated against admissibility, and it did not outweigh the fact that the occurrences were very similar and were completely independent. In addition, despite the fact that petitioner was only convicted of negligent discharge of a firearm in 1989, he had originally been charged with assault with a deadly weapon, and he served a substantial prison term. Accordingly, the trial court found that probative value of the evidence outweighed any prejudice. (*See* 2 RT 610–15).

Later, the jury expressly was instructed that the evidence of petitioner's prior criminal conduct could not be considered "to prove that the defendant is a person of bad character or that he has a disposition to commit crimes," but rather could be considered "only for the limited purpose of determining if it tends to show .. [a] characteristic method, plan or scheme in the commission of criminal acts similar to the method, plan or scheme used in the commission of the offense in [t]his case which would further tend to show the exis-

tence of the intent which is a necessary element of the crime charged; or [a] motive for the commission of the crime charged." The jury further was instructed that it was "not permitted to consider such evidence for any other purpose." (*See* CT 160; 4 RT 2431–32).

Petitioner claims that the trial court erred in admitting other crimes evidence, thus depriving petitioner of a fair trial and constitutional due process. He contends that evidence of his prior crime was inadmissible to prove intent, motive, or common plan or scheme. Because the prior crime to which he pleaded guilty, California Penal Code § 246.3 (negligent discharge of a firearm), is a general intent crime, he contends that the prior crime should not have been admitted to prove his intent to kill with respect to the charged crimes. Further, petitioner contends that the jury may have tended to believe that he was guilty merely because he was a person likely to commit such crimes. (*See* Pet. at 5, Exh. A(1); Trav. at 15–16; Supp. Trav. at 4–9).

### 1. *This claim is not unexhausted.*

■ Preliminarily, the Court will address respondent's contention that this claim is unexhausted. (*See* Ans. at 2; Ans. Mem. at 26–28).

■ Exhaustion requires that the prisoner's contentions be fairly presented to the state courts and be disposed of on the merits by the highest court of the state. *See James v. Borg,* 24 F.3d 20, 24 (9th Cir.), *cert. denied,* 513 U.S. 935, 115 S.Ct. 333, 130 L.Ed.2d 291 (1994); *Carothers v. Rhay,* 594 F.2d 225, 228 (9th Cir.1979). A claim has not been fairly presented unless the prisoner has described in the state court proceedings *both* the operative facts and the federal legal theory on which his claim is based. *See Duncan v. Henry,* 513 U.S. 364, 365–66, 115 S.Ct. 887, 130

L.Ed.2d 865 (1995); *Picard v. Connor*, 404 U.S. 270, 275–78, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971); *Johnson v. Zenon*, 88 F.3d 828, 830 (9th Cir.1996).

Respondent contends that Ground One of the Petition is unexhausted because, when petitioner made a similar claim on direct appeal, the Court of Appeal declined to address petitioner's claim of federal constitutional error on the ground that it had only been perfunctorily asserted. (*See* Ans. Mem. at 26–27). The Court disagrees that the claim is unexhausted. The issue is whether petitioner fairly presented his claim to the California Supreme Court and whether the California Supreme Court disposed of the claim on the merits. As noted above, in filing the Petition for Review, petitioner's appellate counsel expressly invoked former Rule 33.3 of the California Rules of Court. Former Rule 33.3 (subsequently renumbered as Rule 8.508) provided for the filing of an abbreviated petition for review in the California Supreme Court, following the decision by the Court of Appeal in a criminal case, for the sole purpose of exhausting state remedies before presenting a claim for federal habeas corpus relief. Under former Rule 33.3, it was not necessary for petitioner to brief all of his claims. Rather, petitioner needed only to include in the petition "a brief statement of the factual and legal bases of the claim." *See* former Rule 33.3(b)(3)(C). In the Court's view, petitioner complied with this requirement by setting forth the factual and legal basis for his claim arising out of the admission of other crimes evidence in Section I of his Petition for Review. (*See* Lodged Doc. # 7 at 5–6). Further, the California Supreme Court's summary denial of the Petition for Review constituted a disposition on the merits of the claims raised therein for purposes of federal habeas review. *See Hunter v. Aispuro*, 982 F.2d 344, 348 (9th Cir.), *cert. denied*, 510 U.S. 887, 114 S.Ct. 240, 126 L.Ed.2d 194 (1993)

## 2. *This claim is not procedurally defaulted.*

The Court also disagrees with respondent's contention that this claim is procedurally defaulted because the Court of Appeal stated that it was declining to address this claim since it had only been perfunctorily asserted in the heading. (*See* Ans. at 2; Ans. Mem. at 27–28; Lodged Doc. # 6 at 16–17). In citing former Rule 28(c) (1) (subsequently renumbered as Rule 8.500(c)(1)) and cases applying that rule as the basis for the purported procedural default, respondent is conflating the issue of whether petitioner's claim was **timely** raised before the Court of Appeal (which former Rule 28(c)(1) provided was normally a prerequisite to consideration by the California Supreme Court) with the issue of whether the claim was **properly** raised before the Court of Appeal. The Court further notes in this regard that in neither of the California Supreme Court cases cited by respondent (*People v. Turner*, 8 Cal.4th 137, 32 Cal.Rptr.2d 762, 878 P.2d 521 (1994) and *People v. Hardy*, 2 Cal.4th 86, 150, 5 Cal.Rptr.2d 796, 825 P.2d 781 (1992)) did the California Supreme Court state that the Court of Appeal's rejection of a claim for having only been perfunctorily asserted constituted a state procedural bar that precluded the California Supreme Court's consideration of the claim.

## 3. *In any event, this evidentiary error claim fails on the merits.*

To the extent that petitioner is claiming that the trial court should have excluded the evidence concerning his prior conviction as a matter of state evidentiary law, his claim is not cognizable on federal habeas review. *See Estelle v. McGuire*, 502 U.S. 62, 67–68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) (reiterating that "it is not the province of a federal habeas court to reexamine state court determinations on

state law questions"); *Jammal v. Van de Kamp*, 926 F.2d 918, 919 (9th Cir.1991) (federal habeas courts "do not review questions of state evidence law."). "Habeas relief is available for wrongly admitted evidence only when the questioned evidence renders the trial so fundamentally unfair as to violate federal due process." *Jeffries v. Blodgett*, 5 F.3d 1180, 1192 (9th Cir.1993), *cert. denied*, 510 U.S. 1191, 114 S.Ct. 1294, 127 L.Ed.2d 647 (1994); *see also Windham v. Merkle*, 163 F.3d 1092, 1103 (9th Cir.1998); *Walters v. Maass*, 45 F.3d 1355, 1357 (9th Cir.1995).

Here, the Court concurs with the reasoning of the California Court of Appeal that evidence pertaining to the facts of the prior conviction was relevant to the jury's evaluation of petitioner's intent and motive, and that the strikingly common features between the charged crimes and the 1989 offense, together with the testimony of the gang expert concerning the violent and territorial character of petitioner's gang, were relevant to the prosecution's theory that petitioner "believed that deadly force was not merely justified but necessary in response to an incursion into his gang's territory." (*See* Lodged Doc. # 6 at 14–15).[4]

Moreover, the Court finds that petitioner's reliance on *People v. Scheer*, 68 Cal. App.4th 1009, 1019–20, 80 Cal.Rptr.2d 676 (1998) in support of this claim is misplaced. (*See* Trav. at 15–16; Supp. Trav. at 4–7).

In *Scheer*, the defendant was charged with felony hit and run and vehicular manslaughter. The appellate court held that evidence that the defendant had previously been convicted of fleeing police officers was inadmissible to show intent because intent was not an element of the charged crime of felony hit and run (a general intent crime), and the evidence of the prior conviction was inadmissible to show motive because there was no "nexus or direct link between the commission of the prior misconduct and the charged crime." *See Scheer*, 68 Cal.App.4th at 1019–20, 80 Cal. Rptr.2d 676. By way of contrast, in the instant case, intent was an element of the charged crimes of first degree murder and attempted murder, and the numerous commonalities between those charged crimes and the prior offense provided a basis for the jury to draw the inference that petitioner's motive in both instances arose from his gang affiliation.[5] Because the challenged evidence was thus relevant to issues in the case, its admission cannot be said to have violated due process. *See McGuire*, 502 U.S. at 70, 112 S.Ct. 475; *Jammal*, 926 F.2d at 920 ("Only if there are no permissible inferences the jury can draw from the evidence can its admission violate due process."); *McKinney v. Rees*, 993 F.2d 1378, 1384 (9th Cir.) (as amended), *cert. denied*, 510 U.S. 1020, 114 S.Ct. 622, 126 L.Ed.2d 586 (1993).

---

4. Under *Ylst v. Nunnemaker*, 501 U.S. 797, 803–04, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991), it may be presumed that the California Supreme Court, by its silent denial of petitioner's Petition for Review raising this same claim, did not intend to change the California Court of Appeal's reasoned decision rejecting it.

5. Petitioner further contends that "the jury was not retraint [sic] as to how they were to use the 1989 general intent crime." (*See* Supp. Trav. at 8). However, this contention is belied by the record. The jury was given a

limiting instruction, CALJIC 2.50, that limited the jury's consideration of the evidence of the prior crime to its determination of intent and motive. (*See* CT 160; 5 RT 2431–32). To the extent that petitioner also is contending that the trial court gave the modified version of CALJIC 2.50 that the appellate court in *Scheer* found to be "an incorrect fusion of two distinct concepts: motive and common plan or design" (*see* Supp. Trav. at 6), his contention also is belied by the record. In petitioner's case, by way of contrast to *Scheer*, the jury was instructed with the unaltered version of CALJIC 2.50. (*See* CT 160; 5 RT 2431–32).

Further, to the extent that petitioner is claiming that the evidence impermissibly permitted the jury to infer that he was a bad person likely to commit the charged crimes, the Court notes that the Supreme Court has never held that the admission of propensity evidence violates due process. *See McGuire*, 502 U.S. at 75 n. 5, 112 S.Ct. 475 ("[W]e express no opinion on whether a state law would violate the Due Process Clause if it permitted the use of 'prior crime' evidence to show propensity to commit a charged crime."); *Alberni v. McDaniel*, 458 F.3d 860, 866–67 (9th Cir. 2006) (declining to declare a constitutional principle relating to the propriety of admitting propensity evidence clearly established where the Supreme Court "had expressly concluded the issue was an 'open question' "). Moreover, the jury here was expressly instructed not to consider the evidence of petitioner's prior criminal conduct to prove that petitioner was a person of bad character or that he had a disposition to commit crimes or for any purpose other than the limited purpose for which it was admitted. The Court is required to presume that the jury followed the instructions given unless there is admissible evidence to the contrary. *See Weeks v. Angelone*, 528 U.S. 225, 234, 120 S.Ct. 727, 145 L.Ed.2d 727 (2000); *Richardson v. Marsh*, 481 U.S. 200, 211, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987); *Francis v. Franklin*, 471 U.S. 307, 324 n. 9, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985); *Hovey v. Ayers*, 458 F.3d 892, 913 (9th Cir.2006). Petitioner has failed to adduce any evidence showing the jury failed to follow the instructions it was given.

The Court therefore finds and concludes that the state courts' rejection of this evidentiary error claim neither was contrary to nor involved an unreasonable application of clearly established Supreme Court law.

**B.** ***Habeas relief is not warranted with respect to petitioner's claim that he was denied the opportunity to develop impeaching evidence against a belatedly-disclosed witness.***

Petitioner claims that his Sixth and Fourteenth Amendment rights were denied when he was denied the opportunity to develop impeaching evidence against a belatedly-disclosed witness. (*See* Pet. at 5, Exh. A(1); Trav. at 16–17). Petitioner contends that the prosecution failed to disclose a witness, Raul Castro, "until the last minute" and that the trial court's refusal to grant petitioner a continuance to investigate Castro's criminal record deprived petitioner of his constitutional rights. (*See* Trav. at 16–17).[6]

### 1. *The record below*

On the morning of the fifth day of trial, December 29, 2003,[7] the prosecutor provided the trial court and defense counsel with a rap sheet for prosecution witness Raul Castro, who was the victim in petitioner's 1989 conviction. The court indicated that defense counsel might be entitled to prove two offenses against Castro, each of which

---

**6.** Once again, to the extent that petitioner may be contending that the trial court violated California law pertaining to discovery or pertaining to the granting of a continuance, such claims involve solely the interpretation and/or application of state law and are not cognizable on federal habeas review.

**7.** Jury selection commenced on December 11, 2003, and the jury was seated on the afternoon of December 15, 2003. (*See* 2 RT 17–19, 623–27). Testimony was heard from the morning of December 16, 2003, through December 18, 2003. At the end of that day, the court took a previously-agreed-upon recess until Monday, December 29, 2003. (*See* 2 RT 901; 3 RT 1574).

was listed as an "arrest" on the rap sheet without a final disposition, but held that counsel would need to present evidence substantiating any conviction before he would be able to question the witness about the arrests. The first incident was an arrest and detention for robbery as a juvenile, and the second was an arrest for misdemeanor spousal battery. (4 RT 1801–03). Defense counsel informed the court that he would need time to investigate the potential impeachment matters and complained that he had not been provided with the rap sheet earlier. (4 RT 1803).

That afternoon, defense counsel reported that he had spoken with Castro, and that Castro had denied involvement with the robbery for which he was arrested and claimed that he was only getting a ride with friends at the time of his arrest. Castro claimed that he was detained for about two weeks and then released, with no further action. Similarly, Castro denied that he had battered his girlfriend and claimed that no charges were filed against him following that arrest. Defense counsel again complained that he had had no time in which to verify the claims of the witness. Counsel requested that, as a discovery sanction, the witness not be allowed to testify. The prosecutor explained that she had informed defense counsel the prior week that the witness had had a robbery arrest while he was a juvenile. The prosecutor further explained that she had not known she would be able to secure Castro as a witness until the prior week. The prosecutor then offered to continue the matter for a few days to permit defense counsel time to investigate the potential impeachment material. (4 RT 1905–07).

The trial court stated that it would not preclude Castro as a witness, but would consider a request for additional time. Defense counsel objected that it was difficult to obtain juvenile records on short

notice and that he would need the information contained therein to investigate the earlier incident. He asserted that it would take weeks to properly investigate. The court stated that it was not willing to continue the matter for weeks to investigate a "14–year–old robbery case on a tangential issue." (4 RT 1907–10).

The following morning, December 30, 2003, defense counsel again requested that Castro be precluded as a witness. Counsel informed the court that he had obtained the police report pertaining to Castro's battery arrest. He asserted that it might take him weeks to contact Castro's former girlfriend. He then requested a two-week continuance. The trial court ruled that, due to the age of the juvenile incident (despite its potential relevance to reflect on the honesty of the witness), the fact that the incident had never been adjudicated, and the need for the defense counsel to disprove Castro's denial of any involvement in a robbery, the introduction of the robbery arrest would "necessitate the consumption of an undue amount of court time and would pose a significant danger of the jury confusing the issues." The court explained that the request by the defense for time to investigate was "not the basis" of its ruling. Rather, the trial court stated that the matter had "very, very low probative value," and indicated that, even if defense counsel had already located the witnesses, the court would not permit the defense to "conduct a mini trial on a 14–year–old robbery case where there [was] no conviction." (4 RT 2101–08).

Further, the trial court found that the battery incident involved "assaultive conduct, which has a much, much lower probative value on the issue of credibility than a crime like robbery that involves dishonesty." The court held that, while it might be admissible, since the battery charge also had never been adjudicated and the wit-

ness vehemently denied having committed the act, its admission would "necessitate a mini trial on the issue[,] would take an undue amount of time, [ ] and run a significant risk of confusing the issues that are properly before the jury." (4 RT 2108–09). In addition, not only was Castro not a witness to the crimes charged, but the crime in which he was a victim was "substantially corroborated by the testimony" of another witness as well as by the signed statement of petitioner. The court excluded the evidence of Castro's second arrest as well, again finding that "the danger of confusing the issues before the jury and [ ] the undue consumption of time substantially outweighs what I find to be a very, very minimal probative value of this evidence." (4 RT 2109–10).

Finally, the trial court denied defense counsel's request for a continuance on the grounds that, even if counsel had already brought the required witnesses into court, the court "would not find them to be admissible." (4 RT 2110–11).

The prosecutor explained for the record that she had not been assigned to the case until December 2, 2003. Shortly thereafter, on December 10, 2003, she had given an updated witness list to the defense. Her investigator had only located Castro in December, and she had advised counsel that she would make Castro available for an interview. Because of the holidays, her investigating officer had been unable to provide the rap sheet for Castro until December 29, 2003, and she had immediately provided it to the defense. (4 RT 2111–12). Defense counsel did not object to the prosecutor's recitation of these events, but he objected that the prior prosecutor assigned to the case had never indicated that there would be any impeachment material with respect to Castro. The prosecutor clarified that the defense had been provided with notice that petitioner's prior crime against Castro would be used, as well as

with information concerning the victims, in July. Defense counsel acknowledged that he had been provided with Castro's name and the police report pertaining to petitioner's earlier conviction prior to trial. (4 RT 2113–15).

2. *The California Court of Appeal decision*

In rejecting the corresponding claim when petitioner raised it on direct appeal, the California Court of Appeal reasoned as follows:

> *In the midst of trial, a trial court ordinarily has discretion to refuse a request for a continuance. We see no extraordinary circumstances here requiring a continuance. Having had notice that Castro was a potential trial witness since the prior July, [petitioner] never explained to the trial court why he did not earlier seek discovery of the contents of the witness's rap sheet. [Petitioner] also never explained why he could not obtain Castro's former girlfriend as a witness to the battery during the progress of the trial. Further, the trial court's analysis of the potential significance of Castro's impeachment was lengthy and complete. The trial court concluded that it was not reasonably likely that a continuance would result in any significant impeachment evidence. The record supports the trial court's conclusion. [Petitioner] pled guilty to the 1989 shooting and admitted the shooting to the police, corroborating Castro's claims that [petitioner] shot at him without provocation. Castro's battery offense was of marginal significance as a crime of moral turpitude. Neither the robbery offense nor the misdemeanor battery had been adjudicated. Castro's claims of innocence were corroborated by the lack of a prosecution [sic], and the trial court would have had to conduct minitrials to present the im-*

*peachment evidence. From Castro's seemingly truthful explanation of the events of the claimed robbery and battery, it was highly unlikely that [petitioner] would have been able to develop useful impeachment evidence even with a continuance.*

*On this record, [petitioner] has not shown an abuse of discretion, or that [petitioner] was prevented from presenting material evidence in defense that was reasonably likely to have affected the outcome of his trial.* (Lodged Doc. # 6 at 19–20 (internal footnote and citations omitted)).

### 3. *Analysis*

To the extent that petitioner is purporting to claim that the prosecution's belated disclosure of Castro as a witness violated his constitutional rights, the Court finds that such a claim is belied by the record. The record reflects that the prosecution notified defense counsel months before trial that Castro was a potential witness and informed counsel of the possibility of impeachment evidence for the witness at least several days before Castro ultimately testified on December 30, 2008.

 To the extent that petitioner is claiming that the trial court's denial of his request for a continuance violated his constitutional rights, the Court notes that trial courts are accorded broad discretion on matters regarding continuances. *See Morris v. Slappy,* 461 U.S. 1, 11–12, 103 S.Ct. 1610, 75 L.Ed.2d 610 (1983); *Ungar v. Sarafite,* 376 U.S. 575, 589, 84 S.Ct. 841, 11 L.Ed.2d 921 (1964). The denial of a continuance constitutes an abuse of discretion when the trial court arbitrarily insists "upon expeditiousness in the face of a justifiable request for a delay." *Morris,* 461 U.S. at 11–12, 103 S.Ct. 1610. In *Armant v. Marquez,* 772 F.2d 552, 556 (9th Cir. 1985), the Ninth Circuit recited the four factors used to determine whether the trial court abused its discretion in denying a requested continuance: (1) the degree of diligence by the petitioner prior to seeking the continuance; (2) whether the continuance would have served a useful purpose; (3) whether the continuance would have inconvenienced the court or the prosecution; and (4) the amount of prejudice suffered by the petitioner. These factors are considered together, and the weight accorded any one factor depends on the circumstances of each case. "At a minimum, however, in order to succeed, the [petitioner] must show some prejudice resulting from the court's denial." *See Armant,* 772 F.2d at 556–57; *see also Gallego v. McDaniel,* 124 F.3d 1065, 1072 (9th Cir. 1997) (petitioner must demonstrate that denial of continuance caused actual prejudice), *cert. denied,* 524 U.S. 917, 118 S.Ct. 2299, 141 L.Ed.2d 159 (1998).

Here, the Court concurs with the Court of Appeal that the trial court did not abuse its discretion in denying petitioner's request for a continuance. First, petitioner failed to exercise diligence prior to seeking the continuance. He was on notice for months that Castro might testify, and he was aware for several days before Castro was called to testify that potential impeachment material existed. Petitioner has failed to show why he was unable to investigate the witness prior to seeking a continuance. Second, a continuance would not have served a useful purpose because the introduction of either of Castro's arrests would have required that petitioner present witnesses whose testimony contradicted Castro's denial of guilt and the trial court had found that such "mini trials" would be unduly time consuming and confusing for the jury. Third, the requested two-week continuance would have greatly inconvenienced the court because it was being made in the middle of trial and, if granted, the continuance would have extended the trial past the anticipated end

date that the jury had been given when impaneled. Fourth, petitioner has failed to show that he suffered any prejudice from the denial of his continuance request. He has not adduced any admissible evidence of any impeachment material that would have been developed if his continuance request had been granted.

The Court therefore finds and concludes that the state courts' rejection of petitioner's claim pertaining to the potential impeachment evidence for witness Castro neither was contrary to nor involved an unreasonable application of clearly established Supreme Court law.

### C. Habeas relief is not warranted with respect to petitioner's claim arising out of the admission of evidence to show that a prosecution witness was afraid to testify.

Petitioner claims that the trial court erred in allowing the prosecutor to bring in "double hearsay evidence" to show that prosecution witness Dion Jones was afraid to testify, especially because no threats had been made. Petitioner contends that the admission of this evidence was prejudicial. (*See* Pet. at Exh. A(1); Trav. at 17–18).

#### 1. This claim arguably is procedurally defaulted.

Preliminarily, the Court will address respondent's contention that this claim is procedurally barred because petitioner failed to interpose a timely objection in the trial court on federal constitutional grounds. (*See* Ans. Mem. at 47–49).

■ In order for a claim to be procedurally defaulted for federal habeas corpus purposes, the opinion of the last state court rendering a judgment in the case must clearly and expressly state that its judgment rests on a state procedural bar. *Harris v. Reed*, 489 U.S. 255, 263, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989); *see also Coleman v. Thompson*, 501 U.S. 722, 729–30, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991); *Thomas v. Goldsmith*, 979 F.2d 746, 749 (9th Cir.1992).

Under California law, the failure to interpose a specific and timely objection in the trial court on the ground advanced on review independently serves as a procedural bar to consideration of the issue by the appellate courts. *See, e.g.*, Cal. Evid. Code § 353; *People v. Alvarez*, 14 Cal.4th 155, 186, 58 Cal.Rptr.2d 385, 926 P.2d 365 (1996), *cert. denied*, 522 U.S. 829, 118 S.Ct. 94, 139 L.Ed.2d 50 (1997); *People v. Champion*, 9 Cal.4th 879, 918–19, 39 Cal. Rptr.2d 547, 891 P.2d 93 (1995), *cert. denied*, 516 U.S. 1049, 116 S.Ct. 714, 133 L.Ed.2d 668 (1996); *People v. Johnson*, 6 Cal.4th 1, 51, 23 Cal.Rptr.2d 593, 859 P.2d 673 (1993), *cert. denied*, 513 U.S. 844, 115 S.Ct. 133, 130 L.Ed.2d 76 (1994); *People v. Morris*, 53 Cal.3d 152, 187–88, 279 Cal. Rptr. 720, 807 P.2d 949 (1991), *cert. denied*, 502 U.S. 959, 112 S.Ct. 421, 116 L.Ed.2d 441 (1991). The California Supreme Court has held that the state's contemporaneous objection rule bars review of a constitutional due process claim when an objection on this specific ground was not raised at trial. *See People v. Raley*, 2 Cal.4th 870, 892, 8 Cal.Rptr.2d 678, 830 P.2d 712 (1992) ("We reject the constitutional arguments because no objection on these grounds was raised below.")

Here, the California Court of Appeal "clearly and expressly" invoked the foregoing procedural bar when it rejected this evidentiary error claim on direct appeal. (*See* Lodged Doc. # 6 at 24).[8] The Califor-

---

**8.** It makes no difference that the California Court of Appeal also addressed this defaulted claim on the merits. *See Harris*, 489 U.S. at 264 n. 10, 109 S.Ct. 1038; *Carriger v. Lewis*, 971 F.2d 329, 333 (9th Cir.1992) (en banc), *cert. denied*, 507 U.S. 992, 113 S.Ct. 1600, 123 L.Ed.2d 163 (1993).

nia Supreme Court's ensuing summary denial of petitioner's Petition for Review raising the same claim constitutes an adoption of the Court of Appeal's rejection of it on procedural grounds. *See Thomas*, 979 F.2d at 749 ("If the intermediate appellate court judgment rests on procedural default and the state Supreme Court denies review without explanation, the federal courts will consider the claim procedurally defaulted.").

 The failure to comply with a state's contemporaneous objection rule results in a procedural default which bars federal consideration of the issue, unless petitioner can demonstrate both "cause" for his failure to raise the objection at trial and "prejudice" accruing from the error. *See Wainwright v. Sykes*, 433 U.S. 72, 87, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977); *Hines v. Enomoto*, 658 F.2d 667, 673 (9th Cir.1981).

 In order to demonstrate "cause" for a procedural default, petitioner must show "that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986).

Here, petitioner has not even purported to show "cause" for the procedural default. Because petitioner must demonstrate both cause and prejudice (*see Murray*, 477 U.S. at 494, 106 S.Ct. 2639), his inability to demonstrate the requisite "cause" for his procedural default obviates the need for the Court to even reach the issue of whether petitioner has demonstrated the requisite "prejudice." *See Thomas v. Lewis*, 945 F.2d 1119, 1123 n. 10 (9th Cir.1991).

 The Supreme Court has recognized an exception to the requirement that the petitioner demonstrate both "cause" and "prejudice," where the petitioner can demonstrate that failure to consider the procedurally defaulted claims will result in

a fundamental miscarriage of justice because he is actually innocent of the crimes of which he was convicted. *See, e.g., Coleman*, 501 U.S. at 750, 111 S.Ct. 2546; *Murray*, 477 U.S. at 496, 106 S.Ct. 2639; *Noltie v. Peterson*, 9 F.3d 802, 806 (9th Cir.1993). However, in order to qualify for this "miscarriage of justice" exception, the petitioner must "support his allegations of constitutional error with new reliable evidence-whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence-that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995) (recognizing that such evidence "is obviously unavailable in the vast majority of cases"). Further, to establish the requisite probability that a constitutional violation probably has resulted in the conviction of one who is actually innocent, "the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Id.* at 327, 115 S.Ct. 851. Here, petitioner has not even purported to adduce any new reliable evidence or make the requisite showing of actual innocence.

### 2. *Petitioner's evidentiary error claim also fails on the merits.*

Even if petitioner's evidentiary error claim were not procedurally defaulted, habeas relief would not be warranted.

### a. *The record below*

Before Dion Jones (who was 12 at the time of trial) testified, he requested that his grandmother be allowed to sit next to him. The prosecutor explained to the trial court that Jones was very concerned for his safety. Defense counsel did not object, and the court granted the request. (*See* 2 RT 1046–47, 1049). During his testimony, Jones testified that he was nervous and

afraid and had not wanted to testify. However, he denied that his aunt or his grandmother had told him just to tell the police that he did not remember the incident, denied that his aunt had argued with Detective Juarez about his testifying, and claimed that he had not talked to his aunt about the case "in a long time." Jones testified that his aunt was "just mad because they took me out of school." (*See* 2 RT 1050, 1067–68, 1070–72).

Detective Cynthia Juarez testified that she had interviewed Jones on August 2, 2002, at his home and again thereafter at the police station. During the interview at his home, Jones was "a little reluctant" and was nervous. Juarez also testified that she talked to Jones's aunt about the circumstances of the case and whether Jones would testify in the matter. Juarez testified that Jones's aunt was "very angry and upset." The aunt said that Jones had been "very afraid, scared." Defense counsel objected that the comment was hearsay and, after the court sustained the objection, the prosecutor asked to be heard. At a sidebar, the prosecutor argued that the Detective's testimony concerned prior inconsistent statements by Jones. The trial court noted that any testimony that Jones had had a conversation about his testimony while his aunt was present would impeach his denial that his aunt had not made any comments on that subject. Defense counsel objected that the testimony involved hearsay statements that Jones had made to his aunt and the aunt then repeated to Detective Juarez. In response, the prosecutor argued that the testimony was relevant to the state of mind of Jones. The court overruled the hearsay objection, finding that the testimony was not being offered for the truth of the statement but, rather, to impeach Jones's testimony. (*See* 4 RT 1828–32).

Detective Juarez then testified that Jones's aunt told the Detective that Jones did not remember the incident and that that was what he would say if he testified. While Jones was present, the aunt also stated that it would be inconvenient for Jones to appear in court and told the Detective that she did not want Jones to testify because "it was making him too upset and nervous." (*See* 4 RT 1833–35). The Detective also testified that, while Jones was present, Jones's grandmother told her that Jones had been "very nervous and upset" and that he was afraid. Jones appeared afraid during the interview and told Detective Juarez that "he was afraid that something would happen to him if he testified." Juarez testified that she was not aware that petitioner, his friends, or his family had ever threatened Jones or his family. (*See* 4 RT 1873–74).

During jury instructions, the jury was instructed as follows:

"Certain evidence was admitted for a limited purpose. [¶] Detective Juarez testified about statements allegedly made by relatives of Dion Jones that were made in his presence". This evidence was admitted for the following limited purposes:

"(1) For the purpose of showing the effect such statements might have had on Dion Jones' attitude toward this action or toward the giving or testimony"; and

"(2) To evaluate witness Jones' credibility to the extent [ ] you find Detective Juarez's testimony consistent or inconsistent with witness Jones' testimony about whether these statements were made in his presence".

"The weight and significance of this testimony, if any, is a matter for you to determine. [¶] Do not consider this evidence for any purpose except for the limited purpose for which it was admitted." (*See* CT 157; 5 RT 2426–27).

**1109**

*b. The California Court of Appeal decision*

In rejecting the corresponding claim on direct appeal, the California Court of Appeal reasoned:

> *[Petitioner] argues that the aunt's statement was inadmissible double hearsay and that her statement was not admissible as a prior inconsistent statement as the aunt was not a witness at the trial.*
>
> *It is settled that a witness's fear of testifying or an anticipated fear of retaliation is admissible for impeachment because the prosecution is entitled to have the jury put the witness's testimony in its proper context. Such evidence also may bolster the witness's credibility when it is apparent that despite putting his life in danger, a witness has testified. It is well established that there need be no predicate evidence of an actual threat by the defendant or a third party before the witness's fear is admitted into evidence. Evidence tending to contradict any part of a witness's testimony is relevant for purposes of impeachment.*
>
> *[Jones] apparently testified at the trial over his family's objections. His aunt's and grandmother's attitude about his participation in the trial may well have affected his willingness to testify and to disclose all that he knew. The jury was entitled to put his testimony in context. The hearsay objection to Detective Juarez's testimony was not well taken. The detective's claim about what the aunt said was not admitted for*

> *the truth of the matter asserted, but to impeach a claim that [Jones] made at the trial and to show the influences his relatives may have had on his testimony. The jury was given an appropriate limiting instruction on their consideration of this evidence, and presumably, the jury followed the trial court's instructions. We find no error in the ruling.* (Lodged Doc. # 6 at 23–24 (internal citations omitted)).

*c. Analysis*

 As noted above, federal habeas courts do not review questions of state evidence law.[9] The sole issue for purposes of federal habeas review is whether the admission of the challenged evidence concerning Jones's fear of testifying at trial rendered petitioner's trial so fundamentally unfair as to violate due process. Here, the Court concurs with the California Court of Appeal that the evidence relating to comments made by Jones's aunt and grandmother in his presence was relevant to the jury's evaluation of (a) Jones's reluctance to testify, and (b) the credibility of Jones's denial that his relatives had expressed concern about him testifying. Because the testimony was relevant to an issue in the case, its admission cannot be said to have violated due process.

The Court therefore finds and concludes that the state courts' rejection of this evidentiary error claim neither was contrary to nor involved an unreasonable application of clearly established Supreme Court law.

---

**9.** As noted above, the Court of Appeal found that the Detective's testimony concerning statements made by Jones's aunt and grandmother in his presence was not hearsay because the evidence was not admitted for the truth of those statements but, rather, to impeach Jones's own testimony and to "show

the influences his relatives may have had on his testimony." (*See* Lodged Doc. # 6 at 24). In any event, to the extent that petitioner may be contending that the trial court should have excluded this evidence as a matter of state evidentiary law, such a claim is not cognizable on federal habeas review.

### D. Habeas relief is not warranted with respect to petitioner's claim based on the trial court's refusal to give manslaughter instructions.

Petitioner claims that he was denied his constitutional right to a jury trial when the trial court refused to give manslaughter instructions. (*See* Pet. at 6, Exh. A(1); Trav. at 18–20). Petitioner contends that the instructions should have been given where evidence would permit the jury to convict on the lesser included offense. Further, petitioner contends that the prosecutor was required to prove the "absence of 'heat of passion' or sudden provocation when [the] issue is properly presented." (*See* Trav. at 18–20).[10]

#### 1. The record below

Defense counsel requested that the jury be instructed with CALJIC Nos. 8.42, 8.43, and 8.44 on the heat of passion defense to reduce murder to manslaughter and attempted murder to attempted voluntary manslaughter. Counsel argued that there was evidence "suggesting conduct by Mr. Lozano that would raise the necessary heat of passion." When the trial court asked for specific evidence, counsel argued that the testimony of Carboni suggested that the two shirtless and tattooed men were driving slowly through a strange neighborhood. Lozano was acting "in a belligerent manner—drunken, angry, loud manner—towards [petitioner] when he was asking a question." Given the gang environment described by the expert, counsel contended that a reasonable person in such an environment would find that such conduct would "raise the necessary heat of passion." (*See* 5 RT 2402–03).

The trial court denied the request to give the instructions for two reasons. First, the court found that there was "ab-

solutely no evidence before the court, as far as [it is] concerned, that indicates [petitioner] had the subjective mental state required for the heat of passion instructions." In addition, the court found that it was "unjustified" to say that Lozano's comment about "looking at your ugly fucking face" by "itself would cause a reasonable person to act in the heat of passion." The court stated that "under the circumstances of this case, there is no argument—no reasonable argument that [counsel] could make and no reasonable fact finder could find that the reasonable person under those circumstances would act under the influence of heat of passion from the facts of this case." (*See* 5 RT 2403–04).

The trial court, however, agreed to defense counsel's request to instruct on self-defense. The prosecutor argued that there is no evidence that Lozano had a gun or had fired a gun, and no evidence that petitioner was in actual fear. The court disagreed, finding that there was circumstantial evidence to indicate there might have been a gun and, accordingly, there was "substantial evidence to support perfect self-defense". (*See* 5 RT 2404–08). The court also agreed to defense counsel's request to instruct on the theory of imperfect self-defense. The prosecutor objected that, if the jury inferred that Lozano had a gun, then petitioner would be entitled to perfect self-defense, and there would be no question of whether petitioner's fear was reasonable or unreasonable. The court found that, while it agreed with the prosecution that either the jury could conclude that a shot was fired at petitioner and he was acting with a reasonable belief in the necessity to defend himself, or they could conclude that no shot was fired and peti-

---

**10.** Once again, to the extent that petitioner is contending that the omitted instructions should have been given as a matter of Califor- nia law, such a claim is not cognizable on federal habeas review.

tioner was not entitled to self-defense, as a matter of law, the court must give an imperfect self-defense instruction if there was substantial evidence to justify self-defense. (*See* 5 RT 2408–11). The jury was instructed on self-defense, as well as on the lesser included offenses of voluntary manslaughter and attempted voluntary manslaughter based on a theory of imperfect self-defense. (*See* CT 163–65, 168–70, 173–74; 5 RT 2438–42, 2448–52, 2457–60).

During closing arguments, the prosecutor argued that, although the jury had been instructed on voluntary manslaughter as a lesser included offense of both murder and attempted murder, there was "absolutely no evidence for self-defense" or imperfect self-defense to support the findings of voluntary manslaughter or attempted voluntary manslaughter. She argued that there was no evidence to infer or find that Lozano had a gun or had fired a gun. (*See* 5 RT 2471, 2497–99, 2505). The prosecutor also maintained that petitioner could not argue that he was provoked in any way "that any rational human being would say it [sic] rose to the level of he had to do it." Rather, she asserted, petitioner was the aggressor, and he initiated and re-initiated the confrontation with his unarmed victims. He "orchestrated this entire event," and there was "no evidence at all for you to rely upon to make those kinds of decisions that he was defending himself in any way." (*See* 5 RT 2485, 2489–90, 2526–27, 2541–43).

In his closing, defense counsel argued:

"If you do find that [petitioner] was acting in reasonable and objective self-defense and you find that he's not guilty of the murder because of that, then as [the prosecutor] correctly stated, by natural progression of facts and law, you will also have to agree that he is not guilty of the attempted murder of Mr. Carboni and he is not guilty of the shooting into the vehicle."

. . .

"Let's start off considering the self-defense issue. . . . [S]elf-defense encompasses two issues: . . . The first is that there be an actual, real source of danger. That there be an objective fear that [petitioner] could have been killed in this incident. And [the prosecutor] is right, there's no direct evidence that a gun was used by Mr. Lozano against [petitioner]. But she's incorrect when she states there's no circumstantial evidence that properly supports this theory." (5 RT 2551–57).

In pointing out what evidence supported the theory of self-defense, defense counsel argued that the gunshot residual on Lozano's left hand was consistent with Lozano having handled and fired a gun, and that it could have come from the side aperture in the muzzle of the gun even if Lozano was holding the gun in his right hand. Further, he argued, the fact that no shards of glass were found on the street indicated that the window in petitioner's car was broken by a bullet fired into the car rather than out of the car. In addition, there was testimony that three shots were fired, indicating that a single bullet could have been fired into petitioner's car. (*See* 5 RT 2557–61). Counsel argued that, if the jury found such an interpretation reasonable, they should infer that petitioner had a real and objective belief that Lozano was attempting to kill him, and petitioner had the legal justification to fire back. (*See* 5 RT 2562).

Defense counsel then argued that, even if no objective facts indicated that petitioner was truly in danger and was entitled to self-defense, he was still entitled to verdicts of voluntary manslaughter and attempted voluntary manslaughter. He argued that the testimony of the gang expert

supported that petitioner, as a member of a gang surrounded by other hostile gangs, when confronted by two shirtless young men driving slowly and erratically in his gang territory, one with a shaved head and one with tattoos that may not have been identifiable from a distance, one drunk and angry, reasonably believed that he was in danger from a gang challenge. Counsel contended that, even if petitioner initiated the confrontation, if petitioner had a sincere belief he was in danger, then he was guilty only of voluntary manslaughter and attempted voluntary manslaughter. (5 RT 2563–70).

In rebuttal, the prosecutor argued that all of the evidence supported that petitioner was the aggressor and that only petitioner fired shots. There was no evidence that Lozano had a gun or had fired a gun. Further, the victims were not gang members and did not look like gang members. Moreover, she argued that self-defense was not available to petitioner because he had sought out the quarrel. (5 RT 2572–79).

### 2. *The California Court of Appeal decision*

In rejecting the corresponding claim on direct appeal, the California Court of Appeal reasoned:

> *[Petitioner] argues that the circumstances of the shooting, the victims' physical appearances, and Lozano's impertinent statement to [petitioner] provide adequate evidence to support his request for the instructions [on sudden quarrel or heat of passion]. However, [petitioner] did not testify, and no other evidence in our record show that he acted in the heat of passion. Furthermore, as a mater of law, Lozano's statement to [petitioner] did not present adequate provocation to reduce the offenses from murder to manslaughter or to reduce attempted murder to attempted voluntary manslaughter. The claim*

*here of a sudden quarrel or heat of passion was an impermissible effort to set up a gang standard of conduct to justify the shooting. Under state law, the trial court properly refused the instructions.*

> *[Petitioner] argues that the trial court committed federal constitutional error in refusing the instructions. That claim is meritless. There is doubt that the federal Constitution confers any right to lesser included offense instructions in noncapital cases. Even if we concluded that Hopper v. Evans (1982) 456 U.S. 605, 611, 102 S.Ct. 2049, 72 L.Ed.2d 367, applied to noncapital, as well as capital cases, there is no substantial evidence that supported the requested instructions. Where no substantial evidence supports the proposed jury instructions, refusing the instructions does not establish fundamental unfairness or an unreliable verdict.* (Lodged Doc. # 6 at 26 (internal citations omitted)).

### 3. *Analysis*

To the extent that petitioner is claiming that the jury was not instructed on manslaughter, his claim is belied by the record. The jury was instructed on the lesser included offenses of voluntary manslaughter and attempted voluntary manslaughter based on a theory of imperfect self-defense. In fact, defense counsel argued extensively that petitioner, if not entitled to a finding that he acted in self defense, should be convicted only of voluntary manslaughter and attempted voluntary manslaughter because he acted with a real, if unreasonable, fear for his life.

 To the extent that petitioner is claiming that he was unconstitutionally denied adequate instructions on the lesser included offense of voluntary manslaughter based on a theory of heat of passion, the Court notes preliminarily that the United

States Supreme Court has never held that a defendant has a constitutional right to a jury instruction on a lesser offense in a non-capital case. *Cf. Beck v. Alabama,* 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980) (death sentence is not constitutionally imposed after a jury verdict of guilt on a capital offense where the jury was not permitted to consider a lesser included non-capital evidence when the evidence supported such a verdict); *see Solis v. Garcia,* 219 F.3d 922, 929 (9th Cir.2000) (noting that the Ninth Circuit declined to extend *Beck* to non-capital cases), *cert. denied,* 534 U.S. 839, 122 S.Ct. 94, 151 L.Ed.2d 55 (2001). In fact, the Ninth Circuit explicitly has held that "the failure of a state court to instruct on a lesser offense [in a non-capital case] fails to present a federal constitutional question and will not be considered in a federal habeas corpus proceeding." *Bashor v. Risley,* 730 F.2d 1228, 1240 (9th Cir.1984) (parenthetical in original), *cert. denied,* 469 U.S. 838, 105 S.Ct. 137, 83 L.Ed.2d 77 (1984); *see also Windham v. Merkle,* 163 F.3d 1092, 1106 (9th Cir.1998) ("Under the law of this circuit, the failure of a state court to instruct on lesser included offenses in a non-capital case does not present a federal constitutional question."); *Turner v. Marshall,* 63 F.3d 807, 819 (9th Cir.1995) (noting that the Ninth Circuit "has declined to find constitutional error arising from the failure to instruct on a lesser included offense in a noncapital case," and that to hold otherwise would create a new rule in violation of *Teague v. Lane* ), *overruled on other grounds, Tolbert v. Page,* 182 F.3d 677 (9th Cir.1999).

The Ninth Circuit has observed, however, that a "defendant's right to adequate jury instructions on his or her theory of the case might, in some cases, constitute

an exception to the general rule" that the failure of a state trial court to instruct on lesser offenses in a non-capital case does not present a federal constitutional claim. *See Solis,* 219 F.3d at 929 (citation omitted). But such an instruction need only be given when the evidence warrants it. *See Hopper v. Evans,* 456 U.S. 605, 611–12, 102 S.Ct. 2049, 72 L.Ed.2d 367 (1982) (capital case); *Miller v. Stagner,* 768 F.2d 1090, 1091 (9th Cir.1985) (capital case), *cert. denied,* 475 U.S. 1048, 106 S.Ct. 1269, 89 L.Ed.2d 577 and 475 U.S. 1049, 106 S.Ct. 1271, 89 L.Ed.2d 579 (1986); *see also Solis,* 219 F.3d at 929 (there is no constitutional error even where the instruction is consistent with the defense theory where "there was not substantial evidence to support [the lesser] charge"). Here, the Court concurs with the Court of Appeal's finding that there was no substantial evidence that supported the requested instructions on heat of passion. Petitioner did not testify, and he presented absolutely no evidence from which the jury could have inferred that he acted in the heat of passion or that there was adequate provocation to support that a reasonable person would have acted in the heat of passion.

The Court therefore finds and concludes that the state courts' rejection of this instructional error claim neither was contrary to nor involved an unreasonable application of clearly established Supreme Court law.

**E.** ***Habeas relief is not warranted with respect to petitioner's claim that CALJIC No. 8.66.1 allowed the jurors to convict petitioner of attempted murder based solely on petitioner's act of shooting at Lozano.***[11]

Petitioner claims that the guilty verdict on the attempted murder count must be

---

**11.** Respondent contends that this claim is procedurally defaulted because petitioner failed to request a clarifying instruction at

trial. (*See* Ans. Mem. at 51–52). However, the Court has concluded in the interests of judicial economy that it is unnecessary to

reversed because CALJIC No. 8.66.1 allowed the jurors to convict petitioner of the attempted murder of Carboni based solely on petitioner's act of shooting directly at Lozano. (*See* Pet. at Exh. A(1); Trav. at 20–21). Petitioner contends that the "kill zone" theory is inapplicable because the evidence "demonstrates" that petitioner "intended to shoot Lozano only, and did shoot Lozano only." (*See* Trav. at 20).

#### 1. *The record below*

Defense counsel objected to CALJIC No. 8.66.1 on the grounds that it did not apply to the facts of the case. Counsel argued that the evidence reflected that petitioner was approximately two feet away from Carboni when he fired shots at Lozano. He contended that the "kill zone" theory did not apply because, if petitioner had had the specific intent to kill Carboni, he was in a "stronger position to complete that act" than to kill Lozano. (*See* 5 RT 2413). The trial court overruled the objection, finding that the case was "almost an identical situation as in *People v. Blant*" [sic].[12] The court stated that the jury here could reasonably conclude that there was an intent to kill anyone in the "kill zone." (*See* 5 RT 2413–14).

The jury thereafter was instructed:

"A person who primarily intends to kill one person, may also concurrently intend to kill other persons within a particular zone of risk. This zone of risk is termed the 'kill zone.' The intent is concurrent when the nature and scope of the attack, while directed at a primary victim, are such that it is reasonable to infer that the perpetrator intended to ensure harm to the primary victim by harming everyone in that victim's vicinity. [¶] Whether a perpetrator actually intended to kill the victim, either as a primary target or as someone within a 'kill zone,' is an issue to be decided by you." (CT 172; 5 RT 2455).

During closing, the prosecutor argued:

"Let's look at what this issue concurrent intent is. You have—if the person specifically intends to kill their primary target, if you think he intended to kill Giovanni and just missed, you have that theory. You also have a second theory. It's called concurrent intent. A person who primarily intends to kill one person—let's say the victim, Fernando Lozano—may also concurrently intend to kill people within what they call a kill zone. They are so close in proximity that it's reasonable for you as a juror, or anybody, to infer that he intended to ensure [that he] harm the person he was shooting and everyone in that immediate vicinity."

"It isn't logical to ... intend to kill juror number 6 and not think that our alternate, 5 and 11 and 12 and our other alternate are in that kill zone. It doesn't matter. He intends to kill this individual at the expense of anybody

---

determine whether this instructional error claim is procedurally defaulted because even if the claim is considered on the merits, habeas relief still is not warranted. *See Lambrix v. Singletary*, 520 U.S. 518, 525, 117 S.Ct. 1517, 137 L.Ed.2d 771 (1997) (noting that, in the interest of judicial economy, courts might resolve easier matters where complicated procedural default issues exist).

**12.** It is apparent that the trial court intended to refer to *People v. Bland*, 28 Cal.4th 313,

121 Cal.Rptr.2d 546, 48 P.3d 1107 (2002), where the California Supreme Court held that, even if a jury found that a defendant primarily wanted to kill one individual in a car and not the passengers, it "could reasonably also have found a concurrent intent to kill those passengers when defendant and his cohort fired a flurry of bullets at the fleeing car and thereby created a kill zone." *See id.* at 330–31, 121 Cal.Rptr.2d 546, 48 P.3d 1107.

else there. And the intent is to harm anybody in his way. That's what is called concurrent intent. So his intent can be either [ ] to kill Giovanni himself—Giovanni said they made eye contact, so you can find it under that theory. Or he was intending to shoot Fernando and only Fernando and he didn't care that he was gonna kill or about [sic] to kill the person in between the two of them."

"You have to evaluate the nature and the scope of the attack while [sic] it was directed at the principal or primary victim. So you have two separate theories again on how you can find attempted murder with respect to the specific intent. It's either as the primary person, he intends to kill Giovanni himself, or he intends to kill Fernando at the expense and [intends] to harm anyone in the kill zone that they describe." (5 RT 2501–02).

In addition, the prosecutor emphasized that one of the bullets lodged in the driver's door, right were Carboni was seated. This fact, she argued, supports that Carboni was either the intended target or was within the kill zone. (*See* 5 RT 2478, 2499–2500, 2503).

2. *The California Court of Appeal decision*

In rejecting the corresponding claim on direct appeal, the California Court of Appeal reasoned:

> We conclude that there was no reasonable likelihood that the jury would have misunderstood the need for the prosecution to prove specific intent. CALJIC No. 8.66 informed the jury that specific intent to kill was a necessary element of attempted murder. CALJIC No. 8.66.1 elaborated on how the jury should consider the evidence regarding the specific intent to kill where there was a question about who the defendant

had chosen as a target during the shooting. The decision in Bland settled that a defendant can entertain concurrent intent where he creates a "kill zone" to ensure that he kills his intended target and where he is aware that there are other potential victims near his target.

> CALJIC No. 8.66.1 properly sets forth Bland's legal principle and informs the jury that specific intent to kill is a factual issue for its determination. In CALJIC No. 17.31, the trial court told the jury that it was to "[d]isregard any instruction which applies to facts determined by you not to exist," thus informing the jury that they should disregard CALJIC No. 8.66.1 if they determined it was inapplicable. In the prosecutor's closing argument, she explained to the jury the need to find that [petitioner] had a specific intent to kill insofar as [petitioner] was charged with attempted murder. In her explanation, she reiterated in factual terms the principles of specific intent and of concurrent intent in conformity with the trial court's instructions. We conclude that CALJIC No. 8.66.1 did not mislead the jury with respect to the prosecution's burden of proving the necessary elements of attempted murder. (Lodged Doc. # 6 at 28–29 (internal citations omitted, first alteration in original)).

The Court of Appeal also considered the claim as contending that there was "insufficient evidence of intent." The court rejected that claim as well, reasoning:

> The trial evidence established that [Carboni] saw [petitioner] point the revolver right at him as [petitioner] sped off and shot into the Explorer. This evidence was ample to support [petitioner's] conviction on a theory that [petitioner] shot at [Carboni], or he shot at [Carboni] and Lozano. The reasonable inferences from the circumstantial evi-

*dence of [petitioner's] intent also establish that [petitioner's] target may have been Lozano alone. If [petitioner] shot only at Lozano, the trial evidence would support the conclusion by the jury that [Carboni] was in the kill zone. [Petitioner] was aware that [Carboni] was in the car and sitting so close to Lozano that it was probable that [Carboni] could be killed by his bad aim or by a deflected bullet. This evidence supports the jury's conclusion that [petitioner] had the specific intent to kill [Carboni].* (Lodged Doc. # 6 at 29–30).

### 3. Analysis

#### a. Petitioner's instructional error claim

 To merit habeas relief when an allegedly erroneous instruction is given, petitioner must show that "the ailing instruction by itself so infected the entire trial that the resulting conviction violated due process." *See McGuire,* 502 U.S. at 72, 112 S.Ct. 475; *Henderson v. Kibbe,* 431 U.S. 145, 154–55, 97 S.Ct. 1730, 52 L.Ed.2d 203 (1977); *Dunckhurst v. Deeds,* 859 F.2d 110, 114 (9th Cir.1988). Moreover, the allegedly erroneous instruction must be considered in the context of the trial record and the instructions as a whole. *See McGuire,* 502 U.S. at 72, 112 S.Ct. 475; *see also Cupp v. Naughten,* 414 U.S. 141, 147, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973).

In *Bland,* 28 Cal.4th at 330, 121 Cal. Rptr.2d 546, 48 P.3d 1107, the California Supreme Court held that "[w]here the means employed to commit the crime against a primary victim create a zone of harm around that victim, the factfinder can reasonably infer that the defendant intended that harm to all who are in the anticipated zone." Here, as in *Bland,* the record reflects that petitioner fired multiple shots into a vehicle that he knew contained more than one occupant. The Court therefore concurs with the California

Court of Appeal that the contested instruction was applicable to the factual situation in petitioner's case. It follows that the instruction could not have "so infected the entire trial that the resulting conviction violated due process."

The Court therefore finds and concludes that the state courts' rejection of petitioner's instructional error claim neither was contrary to nor involved an unreasonable application of clearly established Supreme Court law.

#### b. Petitioner's insufficiency of the evidence claim

 The California standard for determining the sufficiency of the evidence to support a conviction has been held by the California Supreme Court to be identical to the federal standard enunciated by the United States Supreme Court in *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). *See People v. Johnson,* 26 Cal.3d 557, 576, 162 Cal.Rptr. 431, 606 P.2d 738 (1980). Under this standard, the question is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson,* 443 U.S. at 319, 99 S.Ct. 2781 (emphasis added). In making this determination, the reviewing court "must respect the province of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts by assuming that the jury resolved all conflicts in a manner that supports the verdict." *Walters v. Maass,* 45 F.3d 1355, 1358 (9th Cir.1995); *see also Jackson,* 443 U.S. at 319, 324, 326, 99 S.Ct. 2781. The Ninth Circuit has held that the AEDPA requires an additional degree of deference to a state court's resolution of a sufficiency of the evidence claim. Consequently, habeas

relief is not warranted unless "the state court's application of the *Jackson* standard [was] 'objectively unreasonable.' " *Juan H. v. Allen,* 408 F.3d 1262, 1275 n. 13 (9th Cir.2005) (as amended), *cert. denied,* 546 U.S. 1137, 126 S.Ct. 1142, 163 L.Ed.2d 1000 (2006).

■ Here, the jury was instructed that attempted voluntary manslaughter required that the "attempted murder was committed willfully, deliberately and with premeditation" and that petitioner harbored "a specific intent to kill unlawfully another human being." (CT 165, 171; 5 RT 2442). In addition, the jury was instructed that petitioner could have primarily intended to kill one person, but may also concurrently have intended to kill another individual in the "kill zone." (CT 172; 5 RT 2455). The record reflects that Carboni testified that he saw petitioner pull a gun from his lap and shoot two or three times into Carboni's car when the cars were only a couple of feet apart. Carboni testified that petitioner pointed the gun "towards [him]," and that he tried to maneuver in his car seat to get out of the path of the bullets. (2 RT 932–34, 1000–01). One bullet fragment was found inside the door panel of the driver's door, adjacent to where Carboni was seated when petitioner fired into his car. Further, Lozano was seated in the passenger seat of Carboni's car and was struck by one or two bullets on his shoulder and in his head.

Viewing this evidence in the light most favorable to the prosecution, the Court finds that a rational trier of fact could have found either that petitioner had the specific intent to kill Carboni when he pointed the gun at Carboni, or that he harbored the specific intent to kill Lozano but that Carboni was within the "zone of harm" of the bullets that petitioner fired at Lozano.

Accordingly, to the extent that petitioner is contending that there was insufficient evidence of intent to support the attempted murder conviction, the Court finds and concludes that the state courts' rejection of petitioner's insufficiency of the evidence claim was not an objectively unreasonable application of the *Jackson* standard.

**F. *Habeas relief is not warranted with respect to petitioner's instructional error claim relating to CALJIC Nos. 2.71 and 2.72.***

Petitioner claims that the trial court erred in instructing the jury with CALJIC Nos. 2.71 and 2.72 because petitioner made no admissions regarding the charged offenses. (*See* Pet. at Exh. A(1); Trav. at 21). Petitioner contends that, according to their terms, the instructions related to the charged crimes and, as such, they were inapplicable to petitioner's prior conviction. (*See* Trav. at 21).

1. *The record below*

Defense counsel objected to the jury being instructed with CALJIC Nos. 2.71 and 2.72 because petitioner had made no admissions "regarding the actual pending charges." The court overruled the objection on the bases that petitioner's signed statement concerning his 1989 conviction contained admissions, and he made admissions in his conversation with the detective in the earlier matter. (*See* 5 RT 2412).

The jury thereafter was instructed:

"An admission is a statement made by the defendant which does not by itself acknowledge his guilt of the crimes for which the defendant is on trial, but which statement tends to prove his guilt when considered with the rest of the evidence."

"You are the exclusive judges as to whether the defendant made an admission, and if so, whether the statement is true in whole or in part. Evidence of an oral admission of the defendant not

made in court should be viewed with caution."

"No person may be convicted of a criminal offense unless there is some proof of each element of the crime independent of any admission made by him outside [of] this trial."

"The identity of the person who is alleged to have committed a crime is not an element of the crime nor is the degree of the crime. The identity or degree of the crime may be established by an admission." (CT 161–62; 5 RT 2435).

In closing, the prosecutor argued extensively that the admissions that petitioner made in connection with his 1989 conviction supported both his intent and his motive in the charged crimes. The prosecutor argued that petitioner "admits that he has used a gun in the past to retaliate." (See 5 RT 2484). She further argued:

"He's admitted in the past ... what he was intending, at least with Raul Castro. You have a signed statement from him that he signed. He disrespected my neighborhood. He disrespected me. I basically lied [sic] in wait for him to come out, and I fired a gun at him as soon as he got out in the defense of my neighborhood. That's the inference. That is his intent. I have to defend my neighborhood and my reputation." (5 RT 2513).

She referenced the "statement that he signed himself admitting to gang membership back in 1989." The prosecutor emphasized the limited purpose of the evidence from the 1989 conviction, but argued that petitioner had told the jury "in writing" that he was willing to "defend his gang at all costs"; that in 1989, he "admitted shooting at an unsuspecting, unarmed victim he believed in his mind, warped or otherwise, insulted him." (See 5 RT 2516, 2522–24, 2526–27, 2539).

## 2. *The California Court of Appeal decision*

In rejecting the corresponding claim on direct appeal, the California Court of Appeal reasoned:

*We disagree with [petitioner's] claims that the instructions were given in error. The instructions on admissions cannot be viewed in artificial isolation but must be considered in the context of the instructions as a whole. The issue is whether, in light of the specific language challenged and all the instructions as a whole, there is a "reasonable likelihood" that the jury interpreted the instructions in an impermissible manner. The admissions instructions were necessary as the trial court was required to instruct the jury to view [petitioner's] 1989 admissions with caution. Logically, the jury would have been aware that the instructions on admissions were relevant only to its evaluation of whether [petitioner] committed the prior offense and his intent in doing so. The jury instructions were neither erroneous nor misleading.* (Lodged Doc. # 6 at 31 (internal citations omitted)).

## 3. *Analysis*

As noted above, the allegedly erroneous instructions must be considered in the context of the trial record and the instructions as a whole. Here, the jury expressly was instructed to disregard any instruction that it concluded did not apply to the facts of the case (see CT 179; 5 RT 2583–84) and that the evidence pertaining to petitioner's 1989 conviction only was relevant to the jury's evaluation of petitioner's intent and motive (see CT 160; 4 RT 2431–32). Petitioner has failed to adduce any evidence showing that the jury failed to follow these instructions. Further, while the prosecutor argued extensively that pe-

titioner's admissions in connection with the 1989 crime were relevant to showing petitioner's intent and motive, she never argued or implied that petitioner had made any admissions in connection with the charged crimes. Moreover, the record reflects that no evidence was introduced that petitioner had ever made any comment, statement, or admission in connection with the charged crimes. Accordingly, this Court has no basis for finding that the challenged instructions by themselves so infected the entire trial that petitioner's resulting conviction violated due process.

The Court therefore finds and concludes that the state courts' rejection of this instructional error claim neither was contrary to nor involved an unreasonable application of clearly established Supreme Court law.

### G. Habeas relief is not warranted with respect to petitioner's cumulative error claim.

Respondent contends that petitioner's cumulative claim is unexhausted because petitioner failed to present it in his Petition for Review to the California Supreme Court. (*See* Ans. at 2; Ans. Mem. at 28–29). The Court concurs. (*See* Lodged Doc. # 7). However, the Court has decided to exercise its discretion to deny this unexhausted claim on the merits. *See* 28 U.S.C. § 2254(b) (2); *Jackson v. Roe,* 425 F.3d 654, 658 n. 5 (9th Cir.2005); *Washington v. Lampert,* 422 F.3d 864, 871 (9th Cir.2005), *cert. denied,* 547 U.S. 1074, 126 S.Ct. 1778, 164 L.Ed.2d 525 (2006); *Cassett v. Stewart,* 406 F.3d 614, 624 (9th Cir.2005) (a federal court may deny an unexhausted claim on the merits "only when it is perfectly clear that the applicant does not raise even a colorable federal claim"), *cert. denied,* 546 U.S. 1172, 126 S.Ct. 1336, 164 L.Ed.2d 52 (2006).

The Court's rejection above of all petitioner's claims relating to alleged constitutional errors during his trial is dispositive of any claim that the errors cumulatively caused the denial of a fair trial. *See, e.g., Fisher v. Angelone,* 163 F.3d 835, 852–53 (4th Cir.1998), *cert. denied,* 526 U.S. 1035, 119 S.Ct. 1290, 143 L.Ed.2d 382 (1999); *Jones v. Stotts,* 59 F.3d 143, 147 (10th Cir.1995); *United States v. Gutierrez,* 995 F.2d 169, 173 (9th Cir.1993).

### H. Habeas relief is not warranted with respect to petitioner's sentencing error claim that the enhancements imposed on counts 1 & 2 should have been stricken, not stayed.

Petitioner contends that, under *People v. Bracamonte,* 106 Cal.App.4th 704, 711, 131 Cal.Rptr.2d 334 (2003), the trial court erred by staying instead of striking the additional sentence enhancements under Cal.Penal Code § 12022.53 on Counts 1 and 2. (*See* Pet. at Exh. A(2); Trav. at 22–23).

Respondent contends that this sentencing error claim is not cognizable on federal habeas review because it involves solely the interpretation and application of state sentencing law. (*See* Ans. Mem. at 59–60).[13] The Court concurs. *See, e.g., Christian v. Rhode,* 41 F.3d 461, 469 (9th Cir. 1994); *Cacoperdo v. Demosthenes,* 37 F.3d

13. Respondent also contends that this claim is unexhausted. (*See* Ans. at 2; Ans. Mem. at 28–29). Although respondent is correct that petitioner did not present this claim in his Petition for Review to the California Supreme Court (*see* Lodged Doc. # 7 at 5–19), the exhaustion requirement does not apply to non-cognizable claims. *See Gutierrez v.* Griggs, 695 F.2d 1195, 1197 (9th Cir.1983) (it is unnecessary to determine whether the prisoner satisfied the exhaustion requirement with respect to a non-cognizable claim); *see also Tillett v. Freeman,* 868 F.2d 106, 108 (3d Cir.1989); *Martin v. Solem,* 801 F.2d 324, 331 (8th Cir.1986).

504, 507 (9th Cir.1994), *cert. denied,* 514 U.S. 1026, 115 S.Ct. 1378, 131 L.Ed.2d 232 (1995); *Hendricks v. Zenon,* 993 F.2d 664, 674 (9th Cir.1993); *Miller v. Vasquez,* 868 F.2d 1116, 1118–19 (9th Cir.1989); *see also Sturm v. California Adult Authority,* 395 F.2d 446, 448 (9th Cir.1967) (observing that "a state court's interpretation of its [sentencing] statute does not raise a federal question"), *cert. denied,* 395 U.S. 947, 89 S.Ct. 2021, 23 L.Ed.2d 466 (1969). Moreover, under *Bradshaw v. Richey,* 546 U.S. 74, 76, 126 S.Ct. 602, 163 L.Ed.2d 407 (2005), this Court is bound by the California Court of Appeal's determination that the trial court properly followed California state law in not striking the additional sentence enhancements.

## I. *Habeas relief is not warranted with respect to petitioner's sentencing error claim(s) directed to the imposition of the upper term and consecutive sentences.*

As noted above, at the sentencing hearing, the trial court imposed a term of 25 years to life on count one (first degree murder) plus a consecutive term of 25 years to life for the Cal.Penal Code § 12022.53(d) sentence enhancement (personal and intentional discharge of a firearm proximately causing death). The court stayed a 20–year sentence enhancement under § 12022.53(c) (personal and intentional discharge of a firearm) and a 10–year enhancement under § 12022.53(b) (personal use of a firearm). (*See* 5 RT 3626–27).

With respect to count two (attempted murder), the trial court imposed an upper term of nine years. It reasoned as follows:

"The reason for the selection of the high term is that the crime involved great violence and great bodily harm—

actually the threat of great bodily harm—that's the attempted murder case—and acts disclosing a high degree of cruelty, viciousness, or callousness. [¶] There was absolutely no justification or any excuse for the use of deadly force under these circumstances. The victims were committing the horrible crime of simply driving through a neighborhood and the [petitioner's] actions in viciously gunning down the victim and causing the—and attempting to kill the driver for the act of driving through his neighborhood reflects such a degree of cruelty that the high term is appropriate. [...] [14] There are no circumstances in mitigation. The circumstances in aggravation outweigh the circumstance—the lack of circumstances in mitigation. And the court feels the high term of nine years is appropriate." (*See* 5 RT 3627–28).

The trial court additionally imposed a consecutive 20–year sentence pursuant to § 12022.53(c), and stayed a 10–year sentence under § 12022.53(b). (*See* 5 RT 3628). The court specified that the sentences in counts one and two were to run consecutively because (1) "the manner in which the crime was carried out indicates planning on the part of the [petitioner]" under Cal. R. Ct. 4.421(a)(8); (2) petitioner had engaged in violent conduct that indicates a serious danger to society under Cal. R. Ct. 4.421(b)(1); (3) his prior convictions as an adult were numerous and of increasing seriousness (*see* Cal. R. Ct. 4.421(b)(2)); and (4) he had served a prior prison term within the meaning of Cal. R. Ct. 4.421(b)(3). (*See* 5 RT 3628–29).

With respect to count three (shooting at an occupied motor vehicle), the trial court imposed the mid-term of five years but stayed the sentence pursuant to Cal.Penal

---

**14.** The trial court specified that it was not considering the fact that petitioner was armed under Cal. R. Ct. 4.421(a)(2) because it was imposing a 20–year enhancement under § 12022.53(c). (*See* 5 RT 3628).

Code § 654. (*See* 5 RT 3629). With respect to count four (felon in possession of a firearm), the trial court imposed one-third the mid-term sentence of two years consecutive to count two. The court reiterated its earlier reasons for again imposing consecutive sentences. (*See* 5 RT 3630–31).

Petitioner claims in Ground Nine of the Petition that the imposition of the upper term sentence in count two and the consecutive terms imposed on all counts based on the trial court's factual findings violated petitioner's right to a jury trial under the Sixth Amendment and *Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004). (*See* Pet. at Exh. A(2); Trav. at 4–6). The Court will address in turn the imposition of the upper term sentence and the imposition of the consecutive terms.

### 1. *Applicable law*

In *Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), the Supreme Court held that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." In *Blakely*, 542 U.S. at 303–04, 124 S.Ct. 2531, the Supreme Court held that "the 'statutory maximum' for Apprendi purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*. In other words, the relevant 'statutory maximum' is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose *without* any additional findings." (Italics in original; internal citations omitted). Subsequently, in *United States v. Booker*, 543 U.S. 220, 227, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), the Supreme Court reaffirmed its holding in *Apprendi*, found that "the Sixth Amendment as construed in *Blakely*" did apply to the federal Sentencing Guidelines, invalidated two provisions of the Sentencing Reform Act of 1984 that had had the effect of making the Guidelines mandatory, and held that federal sentences on review would be subject to a review for reasonableness. *See id.* at 226–27, 243–46, 258–65, 125 S.Ct. 738. Most recently, in *Cunningham v. California*, 549 U.S. 270, 127 S.Ct. 856, 868, 166 L.Ed.2d 856 (2007), the Supreme Court invalidated California's determinate sentencing scheme on the basis that it violated *Apprendi's* "bright-line rule," i.e., that "[e]xcept for a prior conviction, 'any fact that increases the penalty beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.' " The Supreme Court found that the middle term described in the California statutes constituted the relevant statutory maximum, and that because aggravating circumstances were found by a judge and not a jury, and need only be established by a preponderance of the evidence, the sentencing scheme violated *Apprendi*. *See id.* at 873.

### 2. *Analysis*

#### a. *The Teague issue*

Respondent has alleged in the Answer that Ground Nine of the Petition is barred by the non-retroactivity doctrine set forth in *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). (*See* Ans. at 3). Where the state properly raises a *Teague* argument, the Court must address it before reaching the merits of the petitioner's claim. *See, e.g., Horn v. Banks*, 536 U.S. 266, 267, 122 S.Ct. 2147, 153 L.Ed.2d 301 (2002) (per curiam); *Caspari v. Bohlen*, 510 U.S. 383, 389, 114 S.Ct. 948, 127 L.Ed.2d 236 (1994); *Butler v. Curry*, 528 F.3d 624, 633 (9th Cir.2008); *Fields v. Brown*, 503 F.3d 755, 770 (9th Cir.2007), *cert. denied*, — U.S. —, 128 S.Ct. 1875, 170 L.Ed.2d 752 (2008).

In *Teague*, the Supreme Court held that, "new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced." *See Teague*, 489 U.S. at 310, 109 S.Ct. 1060. Under *Teague*, the new rule will be applied or announced in cases on collateral review only if it falls into one of two exceptions. *See id.* at 311–13, 109 S.Ct. 1060. To determine whether a habeas petitioner is entitled to the application of a particular rule, the habeas court performs a three-step analysis under *Teague*: (1) the date on which the defendant's conviction became final is determined; (2) the habeas court considers whether the rule is new; [15] and (3) if the rule is new, the court determines whether the rule nonetheless falls within one of the two narrow exceptions to the *Teague* doctrine. *See O'Dell v. Netherland*, 521 U.S. 151, 156, 117 S.Ct. 1969, 138 L.Ed.2d 351 (1997). "In general ... a case announces a new rule when it breaks new ground or imposes a new obligation on the States or the Federal Government." *Teague*, 489 U.S. at 301, 109 S.Ct. 1060. Put another way, "a case announces a new rule if the result was not *dictated* by prec-edent existing at the time the defendant's conviction became final," *see id.*, or put yet another way, "the unlawfulness of [the] conviction was apparent to all reasonable jurists," *Lambrix v. Singletary*, 520 U.S. 518, 527–28, 117 S.Ct. 1517, 137 L.Ed.2d 771 (1997).

Here, respondent contends that the application of a rule prohibiting judicial fact-finding in the imposition of an upper term sentence under California's determinate sentencing law (i.e., what *Cunningham* now holds) [16] would violate *Teague* because petitioner's conviction became final on April 25, 2006, and such a rule was not then dictated by the Supreme Court's prior precedent in *Apprendi*, *Blakely*, and *Booker*. (*See* Ans. Mem. at 8–13). However, the Ninth Circuit recently rejected that very same argument in *Butler*, holding that *Cunningham* did not announce a new rule of constitutional law and could be applied retroactively on collateral review since "*Apprendi*, *Blakely*, and *Booker* made 'courts throughout the land' aware that sentencing schemes that raise the maximum possible term based on facts not found by a jury violate the constitutional rights of defendants." *See Butler*, 528 F.3d at 639.[17]

---

**15.** A rule may be "new" either because the decision relied upon by the habeas petitioner itself announced a new rule after his conviction became final, or because the habeas petitioner seeks to apply a prior decision's "old rule" to a novel setting, such that relief would create a new rule by the extension of the precedent. *See Stringer v. Black*, 503 U.S. 222, 228, 112 S.Ct. 1130, 117 L.Ed.2d 367 (1992).

**16.** By the time respondent filed an Answer in this matter in December 2006, *Cunningham* had not yet been issued.

**17.** Although the Ninth Circuit has granted a stay of the mandate in *Butler*, the panel decision remains the law of the Circuit. *See, e.g., Chambers v. United States*, 22 F.3d 939, 942 n. 3 (9th Cir.1994) ("We reject the government's argument that *X–Citement Video* is not binding precedent until the mandate issues in that case. In this circuit, once a published opinion is filed, it becomes the law of the circuit until withdrawn or reversed by the Supreme Court or an en banc court."), *vacated* on *other grounds*, 47 F.3d 1015 (9th Cir.1995); *United States v. Gomez–Lopez*, 62 F.3d 304, 306 (9th Cir.1995) ("The government first urges us to ignore *Armstrong* since we have stayed the mandate to allow filing of a petition for certiorari; this we will not do, as *Armstrong* is the law of this circuit."); *see also Yong v. I.N.S.*, 208 F.3d 1116, 1119 n. 2 (9th Cir. 2000) (noting that "once a federal circuit court issues a decision, the district courts within that circuit are bound to follow it and have no authority to await a ruling by the Supreme Court before applying the circuit court's decision as binding authority").

Respondent separately contends that the application of a rule prohibiting judicial fact-finding in the imposition of consecutive sentences under California's determinate sentencing law would violate *Teague.* Specifically, respondent asserts that "a survey of the relevant case law at the time [p]etitioner's judgment became final militates against his claim that the consecutive terms imposed on all four counts based on the court's factual findings violated his right to a jury trial." (*See* Ans. Mem. at 13). However, respondent has failed to cite any of the case law authorities upon which this assertion is based. Likewise, respondent has failed to cite any case law or other authority in support of his conclusory assertion that "[h]istorical and jurisprudential bases for the *Blakely* and *Apprendi* holdings did *not* involve consecutive sentencing". (*See id.*). If what respondent means by the latter assertion simply is that *Teague* would be violated by the application of the *Blakely* and *Apprendi* holdings to California's consecutive sentencing scheme because the *Blakely* and *Apprendi* cases themselves involved only the invalidation of upper term sentences, then it seems to the Court that *Butler* also is dispositive of that argument. There, the Ninth Circuit reiterated:

> "[W]hen a general rule must be applied in a new situation, it can hardly be thought to have created a new principle of constitutional law. In particular, in the context of applying rules of constitutional law to statutory schemes from different states, we have noted that applying existing constitutional rules to different state sentencing schemes d[oes] not implicate *Teague.*" *Butler,* 528 F.3d at 634 (internal quotations and citations omitted).

For the foregoing reasons, the Court finds that petitioner's sentencing error claim is not barred by *Teague.*

b. *The imposition of an upper term sentence*

For purposes of applying the AEDPA standard of review to petitioner's sentencing error claim, the Court proceeds from the premise that the governing clearly established Supreme Court law was *Apprendi, Blakely,* and *Booker. See Butler,* 528 F.3d at 640.

i. *The California Court of Appeal opinion was contrary to clearly established Supreme Court law.*

The California Court of Appeal rejected petitioner's *Blakely* challenge to the upper term sentence on the ground that *People v. Black,* 35 Cal.4th 1238, 29 Cal.Rptr.3d 740, 113 P.3d 534 (2005) [hereinafter "*Black (I)*"] already had rejected the argument that an upper term sentence absent jury-made fact-finding was unconstitutional. (*See* Lodged Doc. # 6 at 32–33). Thus, this case is indistinguishable from *Butler,* where the California Court of Appeal likewise had rejected the petitioner's challenge to his upper term sentence based on the California Supreme Court's holding in *Black (I).* The Ninth Circuit found that *Black (I)* was contrary to clearly established Supreme Court law because the California Supreme Court had applied a "traditional judicial factfinding" rule inconsistent with Supreme Court precedent. *See Butler,* 528 F.3d at 641. Accordingly, the Ninth Circuit concluded, the requirements of the AEDPA were met because the underlying Court of Appeal decision based on *Black (I)* was "contrary" to clearly established Supreme Court precedent. Under *Butler,* the Court likewise is compelled to conclude here that the California courts' rejection of petitioner's challenge to his upper term sentence was contrary to clearly established Supreme Court law. The issue thus becomes whether, applying a de novo standard of review, there has been a constitutional violation. *See Butler,*

528 F.3d at 641; *Franz v. Hazey*, 513 F.3d 1002, 1013 (9th Cir.2008).

### ii. The upper term sentence in count two violated the Sixth Amendment.

 Under California law, the middle term must be imposed "unless imposition of the upper or lower term is justified by circumstances in aggravation or mitigation." *See* Cal. R. Ct. 4.420(a). Pursuant to Cal. R. Ct. 4.420(e), "[t]he reasons for selecting the upper or lower term shall be stated orally on the record, and shall include a concise statement of the ultimate facts which the court deemed to constitute circumstances in aggravation or mitigation justifying the term selected." *See also* Cal.Penal Code § 1170(b).

As noted, under *Apprendi*, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490–92, 120 S.Ct. 2348. Here, the trial court imposed the upper term sentence based on his finding that petitioner's crime involved great violence and the threat of great bodily harm and acts disclosing a high degree of cruelty, viciousness, or callousness. (*See* 5 RT 3627). On its face, this aggravating circumstance does not fall within *Apprendi's* prior conviction exception as it involved an assessment of circumstances relating to the crime for which petitioner currently was convicted.[18] Consequently, the trial court could not properly have made this finding. The Court therefore finds and concludes that petitioner's Sixth Amendment right to a jury trial on this aggravating circumstance was violated when it was not submitted to a jury and proven beyond a reasonable doubt.

### iii. The Sixth Amendment violation was harmless error.

 Even if a Sixth Amendment sentencing violation is found, the habeas petitioner is entitled to relief only if the sentencing error was not harmless. *See Washington v. Recuenco*, 548 U.S. 212, 221, 126 S.Ct. 2546, 165 L.Ed.2d 466 (2006) (holding that sentencing errors are subject to harmless error analysis); *Butler*, 528 F.3d at 648 (applying harmless error to *Cunningham* claim). Under *Brecht v. Abrahamson*, 507 U.S. 619, 637–38, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993), the federal habeas court must determine whether "the error had a substantial and injurious effect on [petitioner's] sentence." *Hoffman v. Arave*, 236 F.3d 523, 540 (9th Cir.2001) (internal quotation marks omitted). If the federal habeas court is in "grave doubt" as to whether a jury would have found the relevant aggravating factor beyond a reasonable doubt, relief must be granted. *See O'Neal v. McAninch*, 513 U.S. 432, 436, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995).

Under California law, "only one aggravating factor is necessary to authorize an upper term sentence." *See Butler*, 528 F.3d at 648 (citing *People v. Black*, 41 Cal.4th 799, 805, 62 Cal.Rptr.3d 569, 161 P.3d 1130 (2007) [hereinafter *"Black (II)"*]). "Any *Apprendi* error therefore will be harmless if it is not prejudicial as to just one of the aggravating factors at issue." *Id.* For purposes of the harmless

---

**18.** In *Butler*, the Ninth Circuit held that even the prior conviction exception is a "narrow" one limited by *Shepard v. United States*, 544 U.S. 13, 125 S.Ct. 1254, 161 L.Ed.2d 205 (2005) to consideration of those facts of prior convictions that "can be established by the 'prior judicial record' of conviction." In particular, "the [prior conviction] exception does not extend to qualitative evaluations of the nature or seriousness of past crimes, because such determinations cannot be made solely by looking to the documents of conviction." *See Butler*, 528 F.3d at 644.

error analysis, "the relevant question" is what the trial court "legally *could* have done" after it validly found one aggravating factor; not what it *would* have done had it found only one aggravating factor. *See id.* However, if the federal habeas court is in "grave doubt" as to whether a jury would have found at least one relevant aggravating factor beyond a reasonable doubt, relief must be granted. *See id.*

Under Cal. R. Ct. 4.421(a)(1), the trial may consider as an aggravating circumstance that "[t]he crime involved great violence, great bodily harm, threat of great bodily harm, or other acts disclosing a high degree of cruelty, viciousness, or callousness." In finding that this aggravating circumstance applied here, the trial court cited petitioner's act of shooting at the victims—viciously gunning down one person and attempting to kill another—simply because they were driving through a neighborhood. (*See* 5 RT 3628).

Based on its own independent review of the evidence presented at trial, which the Court has summarized above, the Court is convinced that had the aggravating circumstance cited by the trial court been presented to the jury, the jury would have found it true beyond a reasonable doubt. *See People v. Gutierrez,* 10 Cal.App.4th 1729, 1736, 13 Cal.Rptr.2d 464 (1992) (upholding 4.421(a)(1) aggravating circumstance where defendant *inter alia* fired a gun into a car full of people, which the court found reflected an indifference to human life); *see also People v. Harvey,* 163 Cal.App.3d 90, 117, 208 Cal.Rptr. 910 (1984) (upholding 4.421(a)(1) aggravating circumstance where "[t]he victim was attacked under circumstances where he had no opportunity to defend himself[;] [t]here was no provocation of any sort; and [the attempted murder victim] was shot without any explanation").

Accordingly, the Court finds and concludes that habeas relief is not warranted with respect to petitioner's challenge to the imposition of an upper term sentence because the failure to submit the relevant aggravating circumstance to the jury did not have a substantial and injurious effect on petitioner's sentence.

c. *The imposition of consecutive sentences*

i. *The imposition of consecutive sentences was neither contrary to nor involved an unreasonable application of clearly established Supreme Court law.*

■ At the time of petitioner's sentence, California law required that, whenever a person was convicted of two or more crimes, the judge direct whether the terms of imprisonment for the offenses were to run concurrently or consecutively and that the judge state on the record "the primary factor or factors that support the exercise of discretion" if the judge directed the terms of imprisonment to run consecutively. *See* Cal.Penal Code §§ 669, 1170(c); Cal. R. Ct. 4.406(a)-(b). However, in *Black (I),* the California Supreme Court rejected petitioner's contention that *Blakely* entitled him to a jury trial on any facts that support the trial court's decision to impose consecutive terms. It concluded that "the same reasoning that leads us to conclude that a jury trial is not required on the aggravating factors that justify imposition of the upper term leads us to conclude that a jury trial is not required on the aggravating factors that justify imposition of consecutive sentences." *See Black (I),* 35 Cal.4th at 1261, 29 Cal. Rptr.3d 740, 113 P.3d 534. It further reasoned that *Blakely's* underlying rationale was inapplicable to a trial court's decision whether to require that sentences on two or more offenses be served consecutively or concurrently:

"The high court's decisions in *Blakely* and *Apprendi* are intended to protect the defendant's historical right to a jury trial on all elements of the crime, which the [Supreme Court] concluded would be jeopardized if a legislature could label facts affecting the length of the authorized sentence for an offense as sentencing factors rather than as elements and thereby eliminate the right to a jury trial on such facts. [¶] No such danger is created by a statute that permits judges to decide whether to impose consecutive sentences without jury factfinding. The jury's verdict finding the defendant guilty of two or more crimes authorizes the statutory maximum sentence for each offense. When a judge considers the circumstances of each offense and the defendant's criminal history in determining whether the sentences are to be served concurrently or consecutively, he or she cannot be said to have usurped the jury's historical role. Permitting a judge to make any factual findings related to the choice between concurrent or consecutive sentences does not create an opportunity for legislatures to eliminate the right to a jury trial on elements of the offenses. Nothing in the high court's decisions in *Apprendi, Blakely,* or *Booker* suggests that they apply to factual determinations that do not serve as the 'functional equivalent' of an element of a crime." *Id.* at 1263, 29 Cal.Rptr.3d 740, 113 P.3d 534.

Following the Supreme Court's remand of *Black (I)* for reconsideration in light of *Cunningham,* the California Supreme Court in *Black (II)* again rejected the petitioner's Sixth Amendment challenge to the imposition of consecutive sentences. It noted that *Cunningham* did not address the question whether the principles established in *Blakely* applied to consecutive term sentences under California law. *See Black (II),* 41 Cal.4th at 821, 62 Cal. Rptr.3d 569, 161 P.3d 1130. It then held

that *Cunningham* did not undermine its previous conclusion in *Black (I)* that imposition of consecutive terms under Cal.Penal Code § 669 did not implicate a defendant's Sixth Amendment rights. *See id.* It reasoned in this regard that the requirement of Cal.Penal Code § 669 that concurrent sentences be imposed if the court did not specify how the terms must run did not establish a presumption in favor of concurrent sentences, but rather "merely provides for a default in the event the court fails to exercise its discretion." *See id.* at 822, 62 Cal.Rptr.3d 569, 161 P.3d 1130. It further reasoned:

"In deciding whether to impose consecutive terms, the trial court may consider aggravating and mitigating factors, but there is no requirement that, in order to justify the imposition of consecutive terms, the court find that an aggravating circumstance exists. (*See* § 669; Cal. Rules of Court rule 4.425(a), (b).) Factual findings are not required. In imposing an upper term, the court must set forth on the record 'facts and reasons' (§ 1170, subd.(b)), including the 'ultimate facts that the court deemed to be circumstances in aggravation.' (Cal. Rules of Court, rule 4.420(e).) But it need only cite 'reasons' for other sentencing choices (§ 1170, subd. (c)), and the reasons given for imposing a consecutive sentence need only refer to the 'primary factor or factors' that support the decision to impose such a sentence. (Cal. Rules of Court, rule 4.406(a), (b); § 1170, subd. (c); *see People v. Tran* (1996) 47 Cal.App.4th 759, 774, 54 Cal. Rptr.2d 905.)" *Id.*

While it could be argued that the distinctions drawn in *Black (II)* between "presumption" and "default" and between "reasons" and "factual findings" are a matter of semantics, the fact remains that both *Blakely* and *Apprendi* only dealt with "increas[ing]" the penalty for a crime be-

yond the prescribed statutory maximum" for that particular individual crime, not with the imposition of consecutive terms for multiple crimes. *See Blakely,* 542 U.S. at 301, 124 S.Ct. 2531; *Apprendi,* 530 U.S. at 476, 120 S.Ct. 2348. Nor did *Cunningham* deal with the imposition of consecutive terms. The issue there was whether assigning to the trial judge, not the jury, authority to find the facts that expose a defendant to an elevated "upper term" sentence for an individual crime violates a defendant's Sixth and Fourteenth Amendment rights to trial by jury. *See Cunningham,* 127 S.Ct. at 860. Further, petitioner has not cited, and the Court has not located, any Supreme Court precedent holding that imposition of consecutive terms implicates a defendant's Sixth Amendment rights. Indeed, the *Apprendi* court specifically declined to address consecutive sentencing and focused instead on the imposition of an enhanced sentence on one particular count. *See Apprendi,* 530 U.S. at 474, 120 S.Ct. 2348. Since the Supreme Court has never held that the rationale of *Apprendi* and its progeny applies to the imposition of consecutive sentences, the Court is unable to find or conclude that the California courts' rejection of petitioner's challenge to the imposition of consecutive sentences under California's sentencing scheme either was contrary to or involved an unreasonable application of clearly established Supreme Court law. *See Wright v. Van Patten,* 552 U.S. 120, 128 S.Ct. 743, 746–47, 169 L.Ed.2d 583 (2008) (per curiam) ("Because our cases give no clear answer to the question presented, let alone one in [the petitioner's] favor, it cannot be said that the state court unreasonabl[y] appli[ed] clearly established Federal law." (internal quotation marks omitted)); *Musladin,* 127 S.Ct. at 654 ("Given the lack of holdings from this Court regarding" the claim, "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal

law.' " (alterations in original)); *Brewer v. Hall,* 378 F.3d 952, 955 (9th Cir.) ("If no Supreme Court precedent creates clearly established federal law relating to the legal issue the habeas petitioner raised in state court, the state court's decision cannot be contrary to or an unreasonable application of clearly established federal law."), *cert. denied,* 543 U.S. 1037, 125 S.Ct. 814, 160 L.Ed.2d 602 (2004); *see also Wright v. Adams,* No. C06–113 MHP (pr), 2007 WL 3105079 at *8 (N.D.Cal. Oct.23, 2007) ("there is no 'clearly established' Supreme Court authority applying *Apprendi* and its Supreme Court progeny to consecutive sentences").

*ii. The Sixth Amendment violation, if any, was harmless in any event.*

■ In any event, even assuming arguendo that, as a matter of clearly established Supreme Court law, the rationale of *Apprendi* and its progeny does apply to the imposition of consecutive sentences under California's sentencing scheme and petitioner's Sixth Amendment right to a jury trial was violated when petitioner received consecutive sentences based on aggravating factors not submitted to a jury and proven beyond a reasonable doubt, the Court finds and concludes that the error was harmless.

Under Cal. R. Ct. 4.425(b), any circumstances in aggravation or mitigation may be considered in deciding whether to impose consecutive rather than concurrent sentences, except a fact used to impose the upper term, a fact used to otherwise enhance the defendant's prison sentence, and a fact that is an element of the crime. Here, as noted, the trial court based the imposition of consecutive sentences on the following four aggravating factors (none of which fell within the scope of the exceptions cited above): (1) "the manner in which the crime was carried out indicates planning on the part of the [petitioner]"; (2) petitioner had engaged in violent con-

duct that indicates a serious danger to society; (3) his prior convictions as an adult were numerous [19] and of increasing seriousness [20]; and (4) he had served a prior prison term. (*See* 5 RT 3629, 3631).

Under California law, the offense for which a defendant is being sentenced may be considered in determining whether his convictions are of increasing seriousness. *See People v. Clark*, 12 Cal.App.4th 663, 666, 15 Cal.Rptr.2d 709 (1992). Here, petitioner was convicted inter alia of first degree murder and attempted murder. According to the Probation Report, his prior adult convictions were for willful discharge of a firearm in a negligent manner and felon in possession of a firearm. (*See* Probation Report, filed under seal, at 6). First degree murder and attempted murder are indisputably more serious than the weapons charges that petitioner had previously sustained. *See People v. Simon*, 144 Cal.App.3d 761, 766, 193 Cal. Rptr. 28 (1983) (defendant's criminal activity was of increasing seriousness where he had earlier conviction for forgery of checks averaging $49 and here was convicted of 12 counts of forgery of checks in different amounts, including one for $2500); *Searle*, 213 Cal.App.3d at 1098, 261 Cal.Rptr. 898 (current conviction for selling cocaine was "plainly more serious" than a conviction for driving while intoxicated); *People v. Kellett*, 134 Cal.App.3d 949, 962, 185 Cal.Rptr. 1 (1982) (current conviction for vehicle theft was "clearly" of greater seriousness than prior convictions for Unemployment Insurance Code violations and disturbing the peace). The Court therefore is convinced that had this aggravating circumstance been presented to the jury, the jury would have found it true beyond a reasonable doubt.

Further, according to the Probation Report, petitioner served a prior custodial term of approximately 10 months for his willful discharge of a firearm conviction. (*See* Probation Report at 6). The Court therefore is convinced that had the prior prison term aggravating circumstance been presented to the jury, the jury would have found it true beyond a reasonable doubt.

Accordingly, the Court finds and concludes that habeas relief is not warranted with respect to petitioner's challenge to the imposition of consecutive sentences because the failure to submit the relevant aggravating circumstances to the jury, even if a violation of petitioner's Sixth Amendment rights as a matter of clearly established Supreme Court law, did not have a substantial and injurious effect on petitioner's sentence.

## RECOMMENDATION

IT THEREFORE IS RECOMMENDED that the District Court issue an

---

**19.** The Court notes that the aggravating circumstance of numerous prior convictions likely falls within the scope of the prior conviction exception as construed in *Butler*. *See Butler*, 528 F.3d at 643–48. However, the trial court here cited only two prior convictions in making the finding that petitioner had suffered numerous prior convictions. (*See* 5 RT 3631). Under California law, two prior convictions do not qualify as "numerous." *Compare People v. Berry*, 117 Cal.App.3d 184, 191, 172 Cal.Rptr. 756 (1981) (two prior convictions are not "numerous") with *People v. Searle*, 213 Cal.App.3d 1091, 1098, 261 Cal. Rptr. 898 (1989) (three prior convictions are

"numerous") and *People v. Stuart*, 159 Cal. App.4th 312, 314, 70 Cal.Rptr.3d 920 (2008) ("Six prior convictions are plainly 'numerous.' ").

**20.** Under *Butler*, the "increasing seriousness" of a defendant's prior convictions is not an aggravating circumstance that falls within the scope of the prior conviction exception. *See Butler*, 528 F.3d at 644 ("Under our precedents, the [prior conviction] exception does not extend to qualitative evaluations of the nature or seriousness of past crimes, because such determinations cannot be made solely by looking to the documents of conviction.").

Order: (1) approving and adopting this Report and Recommendation; and (2) directing that Judgment be entered denying the Petition and dismissing this action with prejudice.